**MIDCOAST INTERSTATE TRANSMISSION, INC.,
Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Huntsville Utilities Gas System, City of Huntsville, Alabama, et al.,
Intervenors.**

**Nos. 98–1603, 98–1604, 99–1047 and 99–1090.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1999.

Decided Jan. 18, 2000.

Bernard A. Foster III, with whom Marvin T. Griff was on the briefs, argued the cause for petitioner Midcoast Interstate Transmission, Inc.

Marvin T. Griff argued the cause and filed the briefs for petitioners GASP Coalition and Citizens Opposing North Alabama Pipeline Project.

Monique Penn–Jenkins, Attorney, Federal Energy Regulatory Commission, with whom Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel, FERC, were on the briefs, argued the cause for respondent.

Knox Bemis, with whom R. David Hendrickson, James J. Cleary, Glenn W. Letham, James R. Choukas–Bradley, Joshua Menter, Edward J. Grenier, and Gregory K. Lawrence were on the briefs, argued the cause for intervenors. Wendell B. Hunt, Channing D. Strother, Jr., Jeffrey D. Komarow, John T. Stough, Jr., Kevin M. Downey, and Joseph M. Marcoux entered appearances.

Before GINSBURG and RANDOLPH, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion filed by Senior Judge BUCKLEY.

BUCKLEY, Senior Judge:

Midcoast Interstate Transmission, Inc., and two unincorporated associations have filed petitions for review of Federal Ener-

gy Regulatory Commission orders granting Southern Natural Gas Company's application to construct a natural gas pipeline and denying Midcoast's alternative proposals for serving the same markets. Petitioners claim that the Commission failed to make a reasoned evaluation of the competing environmental and economic factors and that its approval of "rolled-in" rates for Southern's project ignored the agency's own policy and precedent. Because we conclude that the Commission neither abused its discretion nor acted contrary to law, we deny the petitions.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

Under section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717–717z (1997), a company seeking to construct and operate any portion of an interstate gas pipeline must apply to the Federal Energy Regulatory Commission ("FERC") for a certificate of public convenience and necessity. 15 U.S.C. § 717f(c)(1)(A). Such a certificate

> shall be issued to any qualified applicant therefor ... if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed ... and that the proposed service ... is or will be required by the present or future public convenience and necessity.

*Id.* § 717f(e). In evaluating certificate applications, FERC employs "a flexible balancing process, in the course of which all the factors are weighed prior to final determination." *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 23, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). Congress and the Commission have both stated that the promotion of competition in the natural gas industry is one of the Commission's regulatory goals. *See General Motors Corp. v. Tracy,* 519 U.S. 278, 283–84, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

Section 4 of the NGA provides that "[a]ll rates and charges" of a natural gas pipe-line must be "just and reasonable." 15 U.S.C. § 717c(a). A pipeline may not change its rates "except after thirty days' notice to the Commission and to the public." *Id.* § 717c(d). When a pipeline files a new rate, FERC may, upon receiving a complaint or on its own initiative, "enter upon a hearing concerning the lawfulness of such rate ...; and, pending such hearing and the decision thereon, the Commission ... may ... defer the use of such rate" for up to five months. *Id.* § 717c(e).

When an interstate pipeline proposes to expand its business through the construction of new facilities ("expansion facilities"), FERC has the authority to establish the initial rates that will be charged customers who will be served by those facilities. *See United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 227, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965) (holding that Commission may establish initial rates as condition to issuing certificate "pending determination of a just and reasonable rate" through a section 4 proceeding). In May 1995, the Commission issued a policy statement governing how the cost of new pipeline construction should be "priced," i.e., reflected in the pipeline's rate structure. *See generally Pricing Policy For New and Existing Facilities Constructed By Interstate Natural Gas Pipelines,* 71 FERC ¶ 61,241 (1995) ("Pricing Policy"). The cost of construction may be recovered in either of two ways: through "incremental" pricing, which imposes an additional charge payable solely by customers who are directly served by the expansion facilities ("expansion customers"); or "rolled-in" pricing, in which the cost of the new facilities are added to the pipeline's total rate base and reflected in rates charged to all customers system-wide. *See TransCanada PipeLines Ltd. v. FERC,* 24 F.3d 305, 307 n. 1 (D.C.Cir. 1994).

Under the Pricing Policy, when FERC grants a certificate of public convenience and necessity, it either sets an incremental rate to be paid by consumers served by

the new facilities or establishes a presumption that the facilities will be of sufficient benefit to existing customers to permit the pipeline to roll their cost into its system-wide rates. *See* Pricing Policy, 71 FERC at 61,915. If the Commission issues a certificate with a presumption of rolled-in pricing, the expansion customers will initially pay the pipeline's existing system-wide rates. Otherwise, they will be required to pay an incremental rate fixed by the Commission at the time the certificate issues. *Id.* at 61,918 n. 12. Those rates will remain in place until superceded by new ones established in accordance with section 4 of the NGA.

To determine whether a pipeline qualifies for rolled-in pricing, FERC "look[s] to the extent to which the new facilities are integrated with the existing facilities and to the specific system benefits produced by the project." *Id.* at 61,915–16. Where the pipeline can establish that the new facilities will provide system-wide benefits and that the rolled in rate would constitute an increase of five percent or less to existing customers, a rebuttable presumption is created in favor of rolled-in rates. *Id.* at 61,916–17. In such instances, the Pricing Policy requires the Commission to approve rolled in rates in the next section 4 proceeding absent evidence of a "significant change in circumstance." *Id.* at 61,918.

While this case was pending, FERC issued a new policy statement on the certification of pipeline projects that arguably would have required incremental pricing for the expansion facilities that are the subject of this case. *See generally Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999). The new policy, however, has no bearing on these proceedings because it does not apply retroactively. *See id.* at 61,750; *Southeastern Michigan Gas Co. v. FERC*, 133 F.3d 34, 37 n. 1 (D.C.Cir.1998) ("Because FERC issued its [new pricing] rule after this case had begun and did not rely on it in this proceeding, we do not consider what effect its application would have had.").

## B. Facts

On January 11, 1996, the municipalities of Huntsville and Decatur, Alabama, (collectively, "the Cities") entered into twenty-year gas supply contracts with Southern Natural Gas Company ("Southern") to become effective following completion of a proposed North Alabama Pipeline and ancillary facilities ("North Alabama Pipeline Project"). At the time, the Cities were being served by Midcoast Interstate Transmission's predecessor, Alabama–Tennessee Natural Gas Company (collectively, "Midcoast"). Shortly thereafter, Southern filed an application with FERC, under section 7 of the NGA, for a certificate of public convenience and necessity to construct and operate these facilities. Southern's proposed pipeline would extend northward 118 miles from Southern's existing west-to-east natural gas pipeline to the Cities. To reach those markets, the new pipeline would have to cross the Tennessee River and Wheeler National Wildlife Refuge.

In July 1996, FERC made a preliminary determination, contingent on the outcome of an ongoing environmental review, that Southern's proposed pipeline was required by the public convenience and necessity. *Southern Natural Gas Co.*, 76 FERC ¶ 61,122, 61,628, 61,647–48 (1996) ("Preliminary Determination"). In it, FERC found that "absent significant changes, [Southern would be allowed] to roll-in the costs of the facilities in its next rate case." *Id.* at 61,637.

During the course of the environmental review of Southern's proposal, FERC considered various system and route options, including the Alabama–Tennessee System Alternative ("Alabama–Tennessee Alternative") for which Midcoast had filed a certificate application. *Southern Natural Gas Co.*, 79 FERC ¶ 61,280, 62,200, 62,205 (1997) ("Certificate Order"); *Alabama-Tennessee Natural Gas Co.*, 79 FERC

¶ 61,283, 62,237 (1997) ("Order on Application"). This alternative consisted, essentially, of improving the capacity and efficiency of Midcoast's existing system through the addition of two compressors and related facilities. These would enable Midcoast to increase delivery pressures, lower rates, and meet the Cities' increasing demands for gas. Approval of the Alabama–Tennessee Alternative would render the Southern project superfluous.

The Final Environmental Impact Statement ("FEIS") for Southern's proposal was released on May 23, 1997. Although it noted that FERC, the Environmental Protection Agency, and the Department of the Interior all agreed that the Alabama–Tennessee Alternative was environmentally preferable to Southern's proposed pipeline, it nevertheless found the adverse impact of Southern's proposed pipeline to be limited, and that, with the adoption of the recommended mitigation measures, the project would be environmentally acceptable. FEIS at S–1. In an order citing this conclusion, FERC approved the construction of the North Alabama Pipeline Project subject to certain conditions, including compliance with specified environmental requirements. Certificate Order, 79 FERC at 62,208, 62,222–23. While it acknowledged the environmental superiority of the Alabama–Tennessee Alternative, the Commission declared that it was approving Southern's project "for countervailing policy reasons." *Id.* at 62,205. It described its decision as "providing for the first time in forty-seven years a competitive alternative for Alabama–Tennessee's current captive customers," *id.* at 62,208, and noted that the Cities had taken advantage of this option by deciding to enter into long-term contracts with Southern rather than having to rely on Midcoast for their natural gas. *Id.* at 62,209. Following the issuance of the certificate, and despite the petition for review of the Commission's decision then pending before this court, Southern proceeded with construction of the pipeline. By September 1999,

Southern had spent approximately $60 million on the project.

The Certificate Order incorporated the Preliminary Determination's "findings with respect to the nonenvironmental issues," *id.* at 62,222, which included those relating to rolled in pricing. As a consequence, the Cities initially will be charged Southern's system-wide rates until such time as new rates are established in a section 4 proceeding. A statement made by Southern's counsel at oral argument and subsequent submissions by the Cities to the court suggest a disagreement as to the Cities' obligation to continue to use Southern's facilities in the event the Commission should order the payment of incremental rates. Southern contends that the Cities are under a twenty-year obligation to utilize the North Alabama Pipeline irrespective of the rates they are required to pay; the Cities maintain that their contracts do not require them to pay other than rolled-in rates.

FERC denied Midcoast's application for the Alabama–Tennessee Alternative. In doing so, the Commission cited Midcoast's failure to determine the correct sizing of the proposed project by conducting an "open season" during which prospective shippers submit their capacity requests, as well as its failure to demonstrate market support in the form of contracts or other understandings with the local distribution companies it proposed to supply. *See* Order on Application, 79 FERC at 62,240–41 (deferring action on application); *Midcoast Interstate Transmission, Inc.*, 83 FERC ¶ 61,195, 61,831 (1998) ("Order Dismissing Application").

Midcoast filed a second certificate application seeking to serve the Cities through a proposed Hartselle System Alternative ("Hartselle Alternative"). This alternative would permit Southern to construct the first 98 miles of its proposed pipeline, at which point the line would be connected with Midcoast's existing system. In this manner, gas originating in the Southern system could be delivered to the Cities

without the need for a new crossing of the environmentally sensitive Tennessee River and Wheeler National Wildlife Refuge. FERC dismissed this application because of Midcoast's failure to provide a complete response to a request for certain environmental information and because, unlike Southern, it had no contracts or other evidence of market support for the project. *See* Order Dismissing Application, 83 FERC at 61,831.

## II. DISCUSSION

Petitioners maintain that FERC's decisions to grant a certificate of public convenience and necessity to Southern and to deny certificates to Midcoast were arbitrary and capricious. They also challenge the Commission's application of its Pricing Policy to establish a presumption that Southern will be able to roll the construction costs of the North Alabama Pipeline Project into its system-wide rates. Finally, GASP Coalition ("GASP"), an unincorporated association of individuals and groups concerned with the environmental aspects of natural gas pipeline regulation, and Citizens Opposing North Alabama Pipeline Project ("CONAPP"), an unincorporated association formed to challenge Southern's expansion project, argue that FERC authorized Southern to exercise the power of eminent domain in violation of the Fifth Amendment to the United States Constitution. We have jurisdiction to hear these consolidated cases pursuant to 15 U.S.C. § 717r(b).

## A. Standard of Review

■ A reviewing court "must uphold the Commission's decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117, 120 (D.C.Cir.1989) (quoting 5 U.S.C. § 706(2)(A) (1982)). The Commission, however, must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Ve-*

*hicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

## B. FERC's Decision to Grant Southern's Certificate

Midcoast asserts that FERC's decision to grant Southern's certificate for the North Alabama Pipeline Project was arbitrary and capricious for two reasons: first, the agency failed adequately to evaluate project alternatives that were environmentally and economically preferable to Southern's proposal; and second, the record does not support FERC's conclusion that Southern's proposal would promote competition in the natural gas market.

■ Under the National Environmental Policy Act ("NEPA"), FERC is required to evaluate the environmental impact of each proposed project and issue an Environmental Impact Statement ("EIS"). *See* 42 U.S.C. § 4332 (1994). The EIS must provide "a detailed statement ... on ... alternatives to the proposed action" and their environmental consequences. *Id.* § 4332(2)(C)(iii). As the Supreme Court has observed, however,

> it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (citations omitted). All that is required is that the agency "identify the reasonable alternatives to the contemplated action" and "look hard at the environmental effects of [its] decision[ ]." *Corridor H Alternatives, Inc. v. Slater,*

166 F.3d 368, 374 (D.C.Cir.1999) (internal quotation marks and citation omitted).

■ FERC concedes the environmental superiority of the Alabama–Tennessee Alternative, but it has given both the environmental issues and the alternatives to the North Alabama Pipeline Project careful consideration. *See* Certificate Order, 79 FERC at 62,202–05. Having taken the required "hard look," the Commission concluded that other values outweighed what the FEIS described as the project's limited but nonetheless acceptable environmental costs if specified mitigation measures were taken. It then conditioned the certificate on Southern's compliance with those measures. This strikes us as responsible agency decision making.

■ Nor can we fault the Commission's rejection of Midcoast's claims of economic superiority for its own alternatives, given the Cities' decisions to enter into long-term contracts with Southern. We have "consistently required the Commission to give weight to the contracts and settlements of the parties before it," provided that its authorization of a proposed service represents the agency's "independent judgment [that] the new service 'is or will be required by the present or future public convenience and necessity.' " *Tejas Power Corp. v. FERC,* 908 F.2d 998, 1003 (D.C.Cir.1990) (quoting NGA § 7(e), 15 U.S.C. § 717f(e)). FERC made such a determination here. In its Certificate Order, it considered Southern's ability to provide the desired service, its own policy of introducing pipeline competition to a market where none had previously existed, the Cities' expressed desire to have an alternate source of natural gas, and the benefits that Southern's proposed pipeline would offer the Cities in terms of increased delivery pressure, better service, and the elimination of scheduling complexities. Certificate Order, 79 FERC at 62,-208–10.

■ FERC was entitled to take competition into consideration in determining whether to approve Southern's certificate application. The agency had developed a long-standing policy of favoring competition in natural gas markets, and it had "identified the benefits that it believed competition throughout that market would afford consumers, and adopted industry-transforming rules aimed at securing them." *See, e.g., Kansas Power and Light Co. v. FERC,* 891 F.2d 939, 942 (D.C.Cir. 1989). FERC was entitled to rely on the general economic theory that the introduction of competition to the market will benefit consumers. *See Associated Gas Distribs. v. FERC,* 824 F.2d 981, 1008–09 (D.C.Cir.1987) ("Agencies do not need to conduct experiments in order to rely on ... predictions that competition will normally lead to lower prices.").

■ Although the Commission has since adopted a new pricing policy that constitutes a distinct departure from its previous approach in situations comparable to the one now before us, that fact is irrelevant to the question of whether it acted arbitrarily or capriciously at the time it issued the orders now being challenged. We are not impressed by Midcoast's arguments that the economic advantages of its alternatives were so self-evident at the time FERC issued the certificate to Southern that its reliance on its existing policy was unreasonable. Nor are we impressed by Midcoast's charge that the Commission has effectively substituted one monopoly for another. The ability of the Cities to contract with Southern on a long-term basis for the shipment of their natural gas reflects the fact that, for the first time, they had a choice of providers. Their choice of one pipeline over another does not evidence a lack of competition. To the contrary, "[u]nsuccessful bidders are no less competitors than the successful one. The presence of two or more suppliers gives buyers a choice." *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 661, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964).

## C. Rolled–In Rate Presumption

### 1. Jurisdiction

The Commission argues that we should dismiss the petitions for review of the rolled-in pricing determination for two reasons. It asserts, first, that the parties are not aggrieved by the order, as required by section 19(b) of the NGA as a precondition to seeking judicial review, 15 U.S.C. § 717r(b) ("Any party ... aggrieved by an order of the Commission ... may obtain a review of such order in [a U.S.] court of appeals"), and second, that the issue is not ripe for review.

While FERC's statement of the law is correct, it ignores the fact that its rolled-in pricing determination can have consequences more immediate than the establishment of a presumption for a future rate proceeding. Midcoast contends, in effect, that but for that determination, it would not be faced with the loss of the Cities' business upon the completion of the North Alabama Pipeline. If that claim survives analysis, there can be no question that Midcoast has suffered a certain, concrete injury that satisfies both the statutory and constitutional requirements for judicial review.

▇▇▇ Whether Midcoast is aggrieved is a question of fact; and where they are in dispute, a court must assume the correctness of the challenging party's version of the facts. See *City of New Orleans, Louisiana v. FERC*, 67 F.3d 947, 952 (D.C.Cir. 1995). Furthermore, in determining whether an injury exists, a court may go beyond the reasons advanced by the challenger in support of its standing. See *American Trucking Ass'ns, Inc. v. United States Dep't of Transp.*, 166 F.3d 374, 385 (D.C.Cir.1999) (inferring an argument in support of standing); *see also United States Int'l Trade Comm'n v. Tenneco West*, 822 F.2d 73, 75 (D.C.Cir.1987) (finding standing for reason other than those offered by Commission).

▇▇▇ Midcoast's response to FERC's aggrievement argument reflects more aston-ishment than coherence. Nevertheless, in its briefs and in the administrative proceedings, Midcoast has presented facts which, if correct, fully support a finding that it has been aggrieved by the pricing determination. Midcoast has calculated that if the Commission had required incremental pricing, Southern would have to charge users of the North Alabama Pipeline an incremental rate of $10.00 in addition to its system-wide rate of $8.80, for a total of $18.80 per decatherm per month, as compared with the $8.60 that Midcoast proposed to charge. Midcoast contends that given this disparity, FERC could not have found that the North Alabama Pipeline would be a "competitive alternative" to Midcoast, Certificate Order, 79 FERC at 62,208; therefore, it would not have authorized its construction.

Accepting, as we must for purposes of our analysis, the accuracy of Midcoast's calculation of the incremental rate Southern would be required to charge, we are satisfied that Midcoast has been aggrieved. As a direct consequence of the agency's action and irrespective of the outcome of a future rate proceeding, Midcoast will have lost the Cities' business from the moment the North Alabama Pipeline begins deliveries of natural gas until the time that the Cities are released from their obligations under the Southern contracts—whether that be at the expiration of twenty years (as Southern contends), or at an earlier date (in the Cities' view) if FERC should subsequently order the payment of other than rolled in rates.

▇▇▇ It is for this reason that we also find the issue ripe for review. FERC argues that the challenge to rolled-in pricing is not ripe because the Preliminary Determination did no more than establish a rebuttable presumption in Southern's favor; therefore, the matter should be deferred until it can be determined whether rolled-in rates will in fact be applied. As we have pointed out, however, Midcoast's injury is based not on the likelihood that

such rates will be imposed in the future but on the inescapable fact that, following the Southern project's completion, Midcoast will lose the Cities' business for an indeterminate period. It is this that distinguishes the present case from *New York State Electric & Gas Corp. v. FERC*, 177 F.3d 1037, 1041 (D.C.Cir.1999), in which we held unripe a challenge to FERC's establishment of a presumption in favor of rolled-in rates in a certificate proceeding. That case was brought not by a competitor, but by a ratepayer who would continue to pay existing rates until it was determined, in the course of the pipeline's next section 4 filing, whether system-wide customers would be required to absorb the cost of new construction through the imposition of rolled-in rates. *Id.* at 1040. Because Midcoast faces an imminent loss irrespective of the outcome of a future rate proceeding, there can be no question that the Commission's pricing determination is ripe for review under the classic test established in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967): the legality of the rolled-in pricing determination is fit for immediate judicial decision, and the hardship faced by Midcoast is indisputable.

### 2. The merits

Having found Midcoast's challenge to be properly before us, we now turn to the merits of its claim. Midcoast alleges that the Commission's decision to establish a presumption of rolled-in rates was erroneous for two reasons: first, the Pricing Policy is not applicable to cases, such as this, that involve questions of fair competition; and second, even if the policy does apply to this case, Southern's project did not meet the policy's criteria for rolled-in pricing.

■ Petitioners' first argument presents a general challenge to the Commission's use of its Pricing Policy in a situation where pipelines of disparate sizes are competing to serve a particular market. Midcoast maintains that, in such instances,

application of the policy will distort market realities because large pipeline systems, such as Southern's, can readily absorb the rolled-in cost of new projects without experiencing a rise in system-wide rates that will exceed the policy's five percent limit. As a result, the cost of the expansion facilities is subsidized by the larger pipeline's existing system-wide customers to the detriment of the smaller competitor. Midcoast argues that to apply the Pricing Policy in a manner that favors one pipeline over another makes a mockery of FERC's contention that its certificate order serves the interest of competition.

■ While it is true that the Commission emphasized the desirability of providing the Cities with a choice between pipelines, Midcoast's argument ignores the independent purpose of the Pricing Policy, which was to "provide parties with greater certainty about the rate design that will be applied" to new pipelines, thereby allowing them to make better decisions as to such matters as the amount of capacity to develop. Pricing Policy, 71 FERC at 61,915. The Commission, and all those who offered comments during the development of the Pricing Policy, felt that such certainty was needed to encourage efficient growth in the natural gas industry as a whole following the Commission's restructuring of the industry to convert pipelines into common carriers. *Id.* at 61,914–15 (discussing orders providing for open-access transportation service and unbundling the sale of gas from related transportation service). In deciding to encourage efficient pipeline expansion by offering greater rate certainty at the outset in circumstances that could affect the balance of market forces, FERC exercised the kind of judgment on matters of policy that Congress has entrusted to it. As the Supreme Court has reminded us, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103

S.Ct. 2856. Because the Commission fully addressed Midcoast's argument, we cannot fault its decision to apply its policy to the facts of this case.

We now address Midcoast's contention that FERC misapplied the Pricing Policy. In reaching a pricing decision, the Commission will evaluate two factors: "the system-wide benefits of the project and the rate impact on existing customers." Pricing Policy, 71 FERC at 61,915. In assessing the first of these, the Commission will "look to the extent to which the new facilities are integrated with the existing facilities and to the specific system benefits conferred by the project." *Id.* at 61,915–16. If the proposed facilities are sufficiently integrated and the impact on existing customers is an increase of five percent or less, the Commission will generally apply the presumption in favor of rolled-in rates. *Id.* at 61,916.

 The "question of how to allocate costs among a pipeline's customers is a difficult issue of fact, and one on which the Commission enjoys broad discretion." *Algonquin Gas Transmission Co. v. FERC,* 948 F.2d 1305, 1313 (D.C.Cir.1991) (internal quotation marks and citation omitted). As always, its conclusions must be supported by substantial evidence; and when FERC determines that rolled-in pricing is warranted, it must "outline[ ] with reasonable particularity the system-wide benefits which each new facility produces." *Id.* (discussing standard of review of Commission's decision in rate case).

 In addition to finding that the system would realize a longterm economic benefit of $25 million, the Commission identified four operational benefits that the Southern project would provide existing customers: enhancement of system reliability, increase in the availability of interruptible transportation service, the availability of new opportunities for marketers and shippers, and the provision of firm service for increased shipments to the Cities by two Southern system shippers.

Preliminary Determination, 76 FERC at 61,638. These benefits are comparable to the examples cited in the Pricing Policy as justifying rolled-in rates, Pricing Policy, 71 FERC at 61,916 ("increased access, reliability, flexibility, or new services"); and FERC has presented sufficient evidence to support its conclusion that these benefits satisfy the first prong of its two-factor test.

In addressing the second, "five percent" prong, the Commission provided a detailed explanation of how it determined that rolling in the project's construction costs would result in a rate increase of only 1.8 percent. *See Southern Natural Gas Co.,* 85 FERC ¶ 61,134, 61,526 (1998) ("Order Amending Certificate"). Although the cost of the project has reportedly increased from $66.6 million at the time the Commission made its computation to $103.5 million, this cost overrun would result in a rate increase of only 2.8 percent, well within the limits of the Pricing Policy. In its Preliminary Determination, the Commission described in detail why it chose a particular depreciation rate and rate of return, why it included or did not include certain portions of Southern's claimed contract demand, and how it calculated the return Southern would receive from the new facility over time. Preliminary Determination, 76 FERC at 61,637–38. Furthermore, the Commission did not blindly accept the numbers provided by Southern, finding, for example, that the long-term system benefit would be some $10 million less than the figure submitted by the pipeline. *Id.* at 61,638. Finally, the Commission specifically addressed the issues Midcoast raised in subsequent motions to reconsider and again explained in some detail how and why it arrived at its conclusions. *See, e.g.,* Certificate Order, 79 FERC at 62,214–15.

Midcoast repeatedly argued that Southern's proposed pipeline was "a downstream lateral for the benefit of one or only a small number of customers" (quoting the Pricing Policy, 71 FERC at 61,917) and,

therefore, should not receive rolled-in pricing under the Pricing Policy. The Commission failed to address this argument in any meaningful way. Instead, it dismissed the issue with the following comment:

> [Midcoast's] assertion that the proposed project is a lateral and thus does not qualify for rolled-in treatment under the policy statement is without merit. As Southern notes, its system generally consists of two parallel mainlines with 15 mainline extensions totaling nearly 1350 miles and serving 66 firm shippers at 196 delivery points. The proposed facilities are similar to Southern's other mainline extensions that have been granted rolled in rate treatment.

Preliminary Determination, 76 FERC at 61,638–39. In responding to Midcoast's argument in later petitions for rehearing, the Commission simply referred back to this conclusory "determination" that the proposal was a mainline extension rather than a lateral. See, e.g., Order Amending Certificate, 85 FERC at 61,526; Southern Natural Gas Co., 86 FERC ¶ 61,129, 61,-437 (1999).

As unsatisfactory as these responses are, we will not remand the issue for further explanation because the reason that downstream laterals built for the sole benefit of a few customers do not qualify for rolled-in pricing is that they cannot meet the first criterion set forth in the Pricing Policy: they do not provide system-wide benefits. This is made clear in the balance of the sentence quoted by Midcoast: in such cases, "the Commission generally will presume that the project should be priced incrementally, *because other shippers will not share in the benefits.*" Pricing Policy, 71 FERC at 61,917 (emphasis added).

Furthermore, the Commission explained that it

> did not rely on th[e] fact [that the proposed facilities are similar to Southern's other mainline expansions] to approve Southern's rolled-in rate proposal.... [T]he Commission based its approval of rolled-in rate treatment on its determi-

nation that the proposal met the pricing policy's two pronged test....

*Southern Natural Gas Co.,* 86 FERC at 61,438. Because the agency's findings of system-wide benefits and a minimal rate impact are supported by substantial evidence, we reject this challenge to its rolled-in pricing determination.

### D. The Decision to Deny Midcoast's Petitions

 Midcoast argues that the Commission's dismissals of its petitions to construct and operate the Alabama–Tennessee and Hartselle alternatives were unreasonable and an abuse of discretion. We disagree.

The application for the Alabama–Tennessee Alternative was rejected because of Midcoast's failure to hold an open season, to solicit permanent capacity release offers, to allocate some existing capacity in a non-discriminatory way through a bidding process, and to demonstrate market support for its proposal. Order Dismissing Application, 83 FERC at 61,829–30. The Hartselle Alternative application was rejected for failure to file an appropriate environmental report and to demonstrate market support. *Id.* at 61,831.

Certain types of market data *"must* accompany each application when tendered for filing." 18 C.F.R. § 157.14(a) (1999) (emphasis added). The data to be submitted include a "[c]onformed copy of each contract, letter of intent or other agreement for sale or transportation of natural gas." *Id.* § 157.14(a)(11)(v). If no agreements exist, the applicant must explain its "basis for assuming that contracts will be consummated and that service will be rendered under the terms contemplated in the application." *Id.* Midcoast failed or was unable to provide this information for either of its proposals. That the latter may be the case is suggested by the statement, in the Commission's order dismissing the applications, that "the shippers responding to Southern's open season adamantly do

not want the service from Midcoast." Order Dismissing Application, 83 FERC at 61,830. Be that as it may, in light of Midcoast's failure to comply with the regulations, FERC's dismissal of the applications is hardly surprising and certainly not unreasonable, arbitrary, or capricious.

### E. Fifth Amendment Claim

 The Fifth Amendment to the United States Constitution provides that private property may not be taken for public use without just compensation. U.S. CONST. amend. V. GASP and CONAPP argue that the promotion of competition in natural gas markets is not a legitimate public interest sufficient to justify the condemnation of the land required for the pipeline's right-of-way. Furthermore, even assuming that the enhancement of competition is a permissible public interest, GASP and CONAPP claim that Southern's taking of private property for its project is not constitutional because competition will not actually be achieved by the Commission's substitution of one natural gas pipeline monopoly for another.

Our role in reviewing the use of the condemnation power is extremely narrow.

> [A]s long as the condemning authorities were rational in their positions that some public purpose was served ... [t]hat suffices to satisfy the Constitution, and we need not make a specific factual determination whether the condemnation will accomplish its objectives.

*National R.R. Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 422–23, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). Furthermore, the NGA explicitly provides that

> [n]othing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already

being served by another natural-gas company.

15 U.S.C. § 717f(g).

Once a certificate has been granted, the statute allows the certificate holder to obtain needed private property by eminent domain. *Id.* § 717f(h). The Commission does not have the discretion to deny a certificate holder the power of eminent domain. As we have already discussed, it was not improper for FERC to consider the desirability of competition when it decided to grant Southern's application, and its action did not result in the substitution of one monopoly for another. In light of the above, and because, in issuing the certificate to Southern, the Commission has explicitly declared that the North Alabama Pipeline will serve the public convenience and necessity, we hold that the takings complained of served a public purpose.

### III. CONCLUSION

For the foregoing reasons, the petitions for review are

*Denied.*