# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 21, 2022          Decided July 8, 2022

No. 20-1492

CITY OF OBERLIN, OHIO,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEXUS GAS TRANSMISSION, LLC,
INTERVENOR

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Carolyn Elefant* argued the cause and filed the briefs for petitioner.

*David Bookbinder, Megan C. Gibson,* and *Ciara Malone* were on the brief for *amici curiae* Landowners in support of petitioner.

*Carol J. Banta*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.

With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*David A. Super* argued the cause for intervenor NEXUS Gas Transmission, LLC. With him on the brief was *Britt Cass Steckman.*

Before: ROGERS and RAO, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.[*]

RAO, *Circuit Judge*: This case concerns whether the Federal Energy Regulatory Commission ("FERC" or "the Commission") properly granted NEXUS Gas Transmission, LLC ("Nexus") a certificate of public convenience and necessity to construct and operate a natural gas pipeline from Ohio to Michigan. After FERC granted Nexus the certificate, the City of Oberlin ("City") petitioned for review claiming, among other things, that FERC did not adequately justify its reliance on agreements to transport gas ultimately bound for export to Canada as evidence of need for the pipeline. *See City of Oberlin v. FERC* ("*Oberlin I*"), 937 F.3d 599, 606 (D.C. Cir. 2019). We agreed that FERC had not explained why considering these agreements was lawful and remanded without vacatur for FERC to justify its decision. *See id.* at 606–07, 611.

On remand, FERC explained its decision. FERC also clarified that it would have granted the certificate even without considering the export agreements. The City again petitions for review, contending that FERC's explanations were arbitrary

---

[*] *Senior Circuit Judge* SENTELLE concurs in the judgment and joins the opinion only to the extent that it expresses the alternative explanation set forth in Section IV.

and capricious or contrary to law and that its decision violates the Takings Clause. We disagree. FERC's justification for considering the agreements to transport gas bound for export is well reasoned and comports with both the Natural Gas Act and the Takings Clause. FERC's alternative explanation that it would have granted Nexus a certificate even without considering the export agreements also passes muster. We deny the petition.

I.

A.

The Natural Gas Act authorizes FERC "to regulate the transportation and sale of natural gas in interstate commerce." *Oberlin I*, 937 F.3d at 602. Section 7, the provision directly at issue in this case, governs the construction and operation of facilities used to transport or sell gas interstate. *See* 15 U.S.C. § 717f. Section 7 requires natural gas companies to receive a certificate from FERC before constructing or operating such a facility. *Id.* § 717f(c)(1)(A). Applications for a certificate are granted or denied according to the standard laid out in Section 7(e). *Id.* § 717f(c)(1)(B). FERC grants a certificate only if the proposed facility "is or will be required by the present or future public convenience and necessity." *Id.* § 717f(e). Determining whether the proposed facility is or will be in the public convenience and necessity "requires the Commission to evaluate all factors bearing on the public interest." *Atl. Refining Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 391 (1959). Once a natural gas company has been issued a certificate, it can exercise eminent domain as needed to secure property for completing the project. 15 U.S.C. § 717f(h).

FERC has issued a policy statement outlining how it determines whether a proposed pipeline is or will be in the public convenience and necessity. *See Certification of New*

*Interstate Nat. Gas Pipeline Facilities* ("*Certificate Policy Statement*"), 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28, 2000). First, FERC determines "whether the project can proceed without subsidies from [the company's] existing customers." *Certificate Policy Statement*, 88 FERC at 61,745. If that threshold has been met, FERC balances adverse effects that cannot be eliminated against the public benefits of the project, an exercise that "is essentially an economic test." *Id.* "Adverse effects may include increased rates for preexisting customers, degradation in service, unfair competition, or negative impact on the environment or landowners' property," and "[p]ublic benefits may include 'meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives.'" *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1309 (D.C. Cir. 2015) (quoting *Certificate Policy Statement*, 88 FERC at 61,748). A common method for applicants to demonstrate a public benefit is by showing demand for the project with precedent agreements, long-term contracts with shippers who would use the pipeline to transport natural gas. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 962 (D.C. Cir. 2021) (citing *Certificate Policy Statement*, 88 FERC at 61,748–49), *cert. denied*, 142 S. Ct. 1668 (2022).

Section 7 applies only to "natural gas companies," defined as persons "engaged in the transportation [or sale] of natural gas in interstate commerce," which is in turn defined as "commerce between any point in a State and any point outside thereof … but only insofar as such commerce takes place within the United States." 15 U.S.C. § 717a(6)–(7). By defining interstate commerce to exclude foreign commerce, the Natural Gas Act excludes companies that import and export

gas, but otherwise operate entirely intrastate, from the definition of "natural gas company." *See Border Pipe Line Co. v. Fed. Power Comm'n*, 171 F.2d 149, 151 (D.C. Cir. 1948). Import/export facilities are instead governed by Section 3 of the Natural Gas Act, 15 U.S.C. § 717b.[1] Section 3, unlike Section 7, does not authorize the use of eminent domain to construct approved facilities.

In addition to governing facilities used to import or export natural gas, Section 3 governs the imports and exports. All persons must get the Secretary of Energy's approval before importing or exporting any natural gas.[2] 15 U.S.C. § 717b(a).

---

[1] Most import/export facilities meet the statutory definition of liquefied natural gas ("LNG") terminals and are thus directly governed by Section 3. *See* 15 U.S.C. §§ 717a(11) (defining LNG terminal), 717b(e) (requiring FERC's approval for the construction of LNG terminals). Gas can also be traded across the American-Mexican and American-Canadian borders with a pipeline, obviating the need for an LNG terminal. Such border-crossing pipelines are not mentioned in the Natural Gas Act. Nevertheless, a series of Executive Orders and FERC regulations have made border-crossing pipelines subject to the same standards as LNG terminals. *See* Exec. Order No. 10,485, 18 Fed. Reg. 5,397 (Sept. 9, 1953) (asserting that "executive permission" is required to construct facilities at the border used to export and import natural gas in order to ensure "the proper conduct of the foreign relations of the United States"); 18 C.F.R. §§ 153.5(b), 153.15(b) (requiring any person applying for either authorization to construct an LNG terminal or authorization to construct a border-crossing pipeline to apply for the other authorization as well).

[2] The Secretary of Energy has delegated jurisdiction over the construction of border-crossing facilities to FERC and has separately delegated the authority to approve imports and exports to the Assistant Secretary of Energy for Fossil Energy. *Sierra Club v. FERC*, 827 F.3d 59, 63 (D.C. Cir. 2016).

Congress has provided that the import or export of gas to or from "a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas[] shall be deemed to be consistent with the public interest." *Id.* § 717b(c). Because the Secretary "shall issue" an order authorizing the proposed exportation or importation unless it finds it "will not be consistent with the public interest," the Secretary must authorize the import or export of gas to a nation with which the United States has a free trade agreement. *Id.* § 717b(a).

B.

The facts of the City's dispute with Nexus are fully recounted in our earlier decision. *See Oberlin I*, 937 F.3d at 603. Nexus filed an application for a certificate of public convenience and necessity so that it could build and operate a natural gas pipeline from Ohio to Michigan, along with four compressor stations along the pipeline's route. Nexus also sought permission to lease capacity from existing pipelines in the Appalachian Basin—where much of the transported gas would be sourced—and from existing pipelines in Michigan to connect the Nexus Project to the Dawn Hub, where gas is traded across the American-Canadian border. Nexus secured eight precedent agreements accounting for 59% of the pipeline's total capacity. Two of those precedent agreements, accounting for 17% of the pipeline's total capacity, were with Canadian companies that serve customers in Canada.

FERC granted Nexus the certificate, finding that the benefits of the project outweighed any adverse effects. *See Nexus Gas Transmission, LLC*, 160 FERC ¶ 61,022 (Aug. 25, 2017) [*Certificate Order*]. On the benefits side, FERC credited all of the precedent agreements, including those for the export of gas to Canada, as evidence of market demand and found that

without the Nexus Project, existing pipelines had insufficient capacity to provide the service contemplated by the Nexus Project. *Id.* PP 40–41. FERC found that Nexus had mitigated adverse effects by incorporating route variations and that "there [was] no evidence that downsizing the project to accommodate only the currently-subscribed level of service would result in any significant reductions in the project's impacts on landowners and communities." *Id.* P 37. Specifically, FERC analyzed the alternative of a smaller pipeline sized to transport the amount of gas contemplated by domestic and export precedent agreements and concluded that doing so would only very slightly reduce the amount of land the project required. *Id.* PP 43–45. FERC recognized that constructing a larger than necessary pipeline would minimize the need for future construction that would adversely affect landowners and the environment, and decided that this benefit outweighed the slightly mitigated impacts of a smaller pipeline. *Id.* P 46. FERC concluded that "[b]ased on the benefits the project will provide and the minimal adverse impacts on existing shippers, other pipelines and their captive customers, and landowners and surrounding communities, … the public convenience and necessity requires approval of" the Nexus Project. *Id.* P 51.

On application for rehearing, the City argued that demand to use the pipeline to transport gas bound for export could not be considered in determining the public convenience and necessity under Section 7. *Nexus Gas Transmission, LLC*, 164 FERC ¶ 61,054 at P 43 (July 25, 2018) [*Rehearing Order*]. FERC, in something of a non sequitur, responded by pointing out that because much of the gas was bound for domestic consumption, the pipeline had to be analyzed under Section 7. *Id.* P 45.

The City petitioned for review, raising various objections to FERC's decision under the Administrative Procedure Act

("APA"). We rejected most of its arguments. *See Oberlin I*, 937 F.3d at 605–11. We agreed, however, that "the Commission never explained why it is lawful to credit demand for export capacity in issuing a Section 7 certificate to an interstate pipeline." *Id.* at 606. And although the certificate could theoretically have been granted even without crediting the export precedent agreements as evidence of a public benefit, we could not affirm on that basis because FERC had not decided that it would do so. *Id.* at 607 n.3. We therefore "remand[ed] to the Commission for further explanation of why—under the Act, the Takings Clause, and the precedent of this Court and the Supreme Court—it is lawful to credit precedent agreements with foreign shippers serving foreign customers toward a finding that an interstate pipeline is required by the public convenience and necessity under Section 7 of the Act." *Id.* at 607–08. We did not vacate FERC's order because we found "it plausible that the Commission will be able to supply the explanations required, and vacatur of the Commission's orders would be quite disruptive, as the Nexus pipeline is currently operational." *Id.* at 611.

This brings us to FERC's decision under review. On remand, FERC elaborated on its reasoning for considering the export precedent agreements in its decision to grant the certificate. FERC explained that even though some of the gas was bound for export, the facility was still a "pipeline transporting gas in interstate commerce." *Nexus Gas Transmission, LLC*, 172 FERC ¶ 61,199 at P 16 (Sept. 3, 2020) [*Remand Order*]. This distinguished the Nexus Project from the pipeline at issue in *Border Pipe Line Co.*, 171 F.2d at 151, where the facility transporting gas bound for export was entirely within one state. The Nexus Project met the interstate commerce criteria, which did not evaporate simply because FERC factored in the export precedent agreements. FERC therefore concluded that the Nexus Project was properly

analyzed as a Section 7 facility, rather than as an export facility under Section 3. *Remand Order* P 16.

FERC next explained why it credited the export precedent agreements as evidence of the Nexus Project's benefit in its Section 7 analysis. FERC emphasized that in deciding whether to grant a certificate under Section 7, it "must consider 'all factors bearing on the public interest,'" *id.* P 11 (quoting *Atl. Refining Co.*, 360 U.S. at 391), and that courts have already approved FERC's crediting precedent agreements as evidence of a benefit, *id.* PP 8, 11 (citing *Oberlin I*, 937 F.3d at 605). FERC gave three reasons why export precedent agreements had "probative value" when assessing the public convenience and necessity. *Id.* P 11. First, FERC reasoned that Congress has determined that exports to free trade nations like Canada are beneficial because Section 3 of the Natural Gas Act states that such exports are per se consistent with the public interest. *Id.* PP 12–14. Second, FERC described a series of domestic benefits that precedent agreements demonstrate will result from the pipeline, regardless of where the gas is ultimately going to be consumed. *Id.* PP 17–18. Third, FERC explained that the particular export precedent agreements at issue demonstrated need for additional capacity to transport gas to the Dawn Hub, and that having sufficient capacity to transport gas to the Dawn Hub served domestic interests. *Id.* PP 19–20. Finally, FERC decided that considering the export precedent agreements did not render granting the certificate violative of Takings Clause. *Id.* PP 22–23. The City again petitioned for review.

II.

We must set aside FERC's order "if it is arbitrary and capricious or otherwise contrary to law." *Oberlin I*, 937 F.3d at 605. We remanded for FERC to explain why it was lawful to

credit precedent agreements to transport gas bound for export as a benefit under Section 7. Its explanation is rational and comports with the Natural Gas Act.

The City proffers two reasons why FERC's crediting of export precedent agreements was unlawful. First, the City maintains that FERC can only consider exports when authorizing export facilities under Section 3, and thus could not approve the Nexus Project under Section 7 while considering the export precedent agreements. Second, the City asserts that FERC's justifications for crediting the export precedent agreements were arbitrary and capricious. Neither objection is convincing.

A.

The City argues that FERC's decision was contrary to law because gas bound for export is not in interstate commerce, and thus cannot be considered when deciding whether to grant a Section 7 certificate. Instead, if exports are to be considered, the City suggests, the project must be analyzed as an export facility under Section 3.

The question concerns the scope of FERC's authority under Section 7. Section 7 authorizes FERC to grant a certificate to a "natural-gas company," 15 U.S.C. § 717f(c)(1)(A), which is defined as "a person engaged in the transportation of natural gas *in interstate commerce*, or the sale *in interstate commerce* of such gas for resale," *id.* § 717a(6) (emphases added). The Act defines "interstate commerce" in a way that excludes foreign commerce. *See id.* § 717a(7). Thus, if a pipeline were engaged in foreign, but not interstate, commerce, the applicant would not be a "natural-gas company," and therefore the pipeline would be outside FERC's

Section 7 authority. *See Border Pipe Line Co.*, 171 F.2d at 150–52.

We agree with FERC's decision to treat the Nexus Project as a Section 7 pipeline, as opposed to a Section 3 export facility, even though some of the gas transported in it will ultimately be exported. Nexus is indisputably using its proposed pipeline to transport gas in interstate commerce. Nexus's application included six precedent agreements to transport gas from Pennsylvania and Ohio for sale across state lines. *See Certificate Order* P 9. It is therefore a "natural-gas company," and FERC was therefore correct to analyze its application under Section 7 even though some of the gas is bound for export.

FERC's inclusion of the export precedent agreements in its Section 7 analysis did not change that. Nothing in Section 7 prohibits considering export precedent agreements in the public convenience and necessity analysis. Section 7(e) directs FERC to grant a certificate to construct a new pipeline whenever the pipeline "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). And as the Supreme Court has explained, this broad language "requires the Commission to evaluate all factors bearing on the public interest." *Atl. Refining Co.*, 360 U.S. at 391.

The City asserts that the gas bound for export is not in interstate commerce, rendering FERC's decision to consider the export precedent agreements contrary to law. But in the Nexus Project the gas bound for export is commingled with the gas bound for domestic, interstate use, and "gas commingled with other gas indisputably flowing in interstate commerce

becomes itself interstate gas." *Okla. Nat. Gas Co. v. FERC*, 28 F.3d 1281, 1285 (D.C. Cir. 1994).

FERC properly considered Nexus' pipeline under Section 7 because the gas transported in the Nexus pipeline is indisputably in interstate commerce.[3] Moreover, FERC could lawfully consider the export precedent agreements because an assessment of the public convenience and necessity requires a consideration of all the factors that might bear on the public interest.

B.

The City also argues that FERC failed to reasonably justify its decision to credit the export precedent agreements as evidence of public convenience and necessity. We hold that FERC's consideration of export precedent agreements as part of its Section 7 analysis was not only lawful, but also adequately justified.

First, FERC relied on the congressional determination that natural gas exports to countries with which the United States has a free trade agreement are beneficial to the public. *Remand Order* PP 12–14. Under Section 3(c) of the Natural Gas Act, exports to nations with which the United States has a free trade agreement for natural gas "shall be deemed to be consistent with the public interest." 15 U.S.C. § 717b(c). The precedent agreements Nexus secured were to transport gas bound for Canada, a nation with which the United States has a free trade agreement for natural gas. *Remand Order* P 14. Exports to Canada are therefore "in the public interest" under Section 3.

---

[3] We need not, and do not, decide whether it is within FERC's Section 7 authority to grant a certificate for a pipeline that crosses state lines but exclusively transports gas ultimately bound for export.

FERC reasoned that, in light of this policy, it was "appropriate to credit contracts for transportation of gas" bound for Canada as evidence of need in its Section 7 analysis. *Id.* In fact, FERC decided that refusing to credit such precedent agreements would "thwart[]" "Congress' directive and intent, as expressed in [S]ection 3." *Id.* P 15. We would be hard pressed to conclude that FERC's reliance on a clear statutory directive was unjustified.

The City objects that FERC's analysis was tantamount to deciding that a finding of "public interest" under Section 3 was interchangeable with a finding of "public convenience and necessity" under Section 7, in contravention of both *Oberlin I* and the Natural Gas Act's granting of eminent domain powers under Section 7, but not Section 3. FERC was clear, however, that a finding that exporting gas was "not inconsistent with the public interest" under Section 3 was not "dispositive of the question whether a pipeline proposed to transport that gas … is required by the public convenience and necessity" under Section 7. *Id.* Far from conflating the two standards, this means that an application could be denied a Section 7 certificate despite having export precedent agreements if the overall benefits of the proposed pipeline failed to outweigh the overall costs. FERC explained that its reliance on Section 3 only justified giving "precedent agreements for the transportation of gas destined for export the same weight … it gives to other precedent agreements." *Id.* The export precedent agreements are simply one input into the assessment of present and future public convenience and necessity.

Second, FERC explained that myriad domestic benefits stem from increasing transportation services for gas shippers regardless of where the gas is ultimately consumed. *Id.* P 17. Specifically, FERC explained that Nexus's proposed pipeline would add "additional capacity to transport gas out of the

Appalachian Basin," and that the precedent agreements were evidence of need for the capacity provided by Nexus's pipeline. *Id.* P 18. FERC also found that agreements to transport gas on Nexus's pipeline would support the "production and sale of domestic gas," which "contributes to the growth of the economy and supports domestic jobs" irrespective of whether the gas ended up here or in Canada. *Id.* The fact that "a portion of the gas is [bound] for export" does not diminish the benefits that flow from the construction of the pipeline. *Town of Weymouth v. FERC*, 2018 WL 6921213, at *1 (D.C. Cir. Dec. 27, 2018). FERC's explanation of how the export precedent agreements evidenced domestic benefits demonstrates "a rational connection between the facts found and the choice made." *United Airlines, Inc. v. FERC*, 827 F.3d 122, 127 (D.C. Cir. 2016) (cleaned up).

Third and finally, FERC decided that these particular precedent agreements with Canadian shippers could be considered as evidence that the Nexus Project was needed because the agreements were to ship gas to the Dawn Hub. *Remand Order* PP 19–20. Located in Ontario, the Dawn Hub "serves as a liquid trading point where supplies move freely to and from the United States and Canada." *Id.* P 19. FERC explained that U.S. gas transported to the Dawn Hub increased the availability of gas that might be transported through Canada and imported back into New York and New England, demonstrating future domestic benefits of expanding pipeline capacity. *Id.* Because the export precedent agreements demonstrated that additional capacity to transport gas to the Dawn Hub was needed, they were probative of the Nexus Project's overall benefits.

The City objects that this reason is arbitrary and capricious because the precedent agreements at issue were with foreign shippers who would deliver the gas for consumption in Canada,

not New York and New England. But FERC may consider the future public convenience and necessity when granting a certificate. *See* 15 U.S.C. § 717f(e) (allowing FERC to grant a certificate when the facility "is *or will be* required by the present *or future* public convenience and necessity") (emphasis added). In any event, FERC explained that having adequate capacity to ship gas to the Dawn Hub had domestic benefits, and that the export precedent agreements were evidence of the public demand for additional capacity to transport gas from the Appalachian Basin to the Dawn Hub. This is an "adequate explanation of the agency's decision." *Oberlin I*, 937 F.3d at 605 (cleaned up).

We hold that FERC reasonably explained why it considered Nexus' export precedent agreements in granting a certificate of public convenience and necessity under Section 7.

III.

In addition to its statutory arguments, the City maintains that FERC's crediting export precedent agreements as a benefit runs afoul of the Takings Clause because a pipeline shipping gas for export "does not serve a public use." In its order on remand, FERC decided there was no constitutional concern as long as its Section 7 determination was properly made. *Remand Order* P 23. We review that constitutional decision de novo. *See Nat'l Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1179 (D.C. Cir. 2014).

Under the Takings Clause, for the exercise of eminent domain to be legitimate, the property must be seized for "public use." U.S. CONST. amend. V. The Supreme Court has held that property taken for a "public purpose" qualifies. *Kelo v. City of New London*, 545 U.S. 469, 480 (2005). And courts must look to the legislature's judgment about whether a taking is for a

public purpose. *Id.* "[S]o long as the taking is rationally related to a conceivable public purpose," it is constitutional. *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 422 (1992) (cleaned up).

Congress determined that natural gas pipelines that are duly certified as being in the public convenience and necessity serve a public purpose. *See* 15 U.S.C. § 717f(h) (granting certificate-holding natural gas companies the federal eminent domain power). We have already held that judgment is rational. *See Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000) (explaining that, since FERC lawfully declared that a pipeline would "serve the public convenience and necessity," it "served a public purpose"). So long as FERC's crediting of export agreements is consistent with the Natural Gas Act, it furthers a public purpose consistent with the Takings Clause. *Cf. id.* (holding that because it was "not improper for FERC to consider the desirability of competition" under the Natural Gas Act, the consideration of that factor did not violate the Takings Clause).

In *Oberlin I*, we found FERC's Takings Clause explanation wanting because it "beg[ged] the unanswered question of whether … it is lawful for the Commission to credit precedent agreements for export toward a finding that a pipeline is required by the public convenience and necessity." 937 F.3d at 607. Having now answered that question in the affirmative, we hold FERC's decision does not violate the Takings Clause.

The City recycles its statutory argument that, by considering export precedent agreements as a benefit, FERC substituted a Section 3 "public interest" finding for a Section 7 "public convenience and necessity" finding, and that since Section 3 does not authorize the use of eminent domain, that

conflation violated the Takings Clause. But as already explained, FERC considered the export precedent agreements as one of the many factors in determining the public convenience and necessity, and thus did not conflate Sections 3 and 7. Its decision to grant Nexus the certificate under Section 7 was proper. The City also asserts that, by arguing that a finding of public convenience and necessity under Section 7 satisfies the Takings Clause per se, FERC is putting itself beyond the reach of the Fifth Amendment. But that is not so. Rather, Congress has allowed FERC to determine when a pipeline meets the public convenience and necessity standard, and that determination is subject to judicial review.

## IV.

We also uphold FERC's alternative explanation that the Nexus Project was in the public convenience and necessity even discounting the precedent agreements with Canadian companies.[4] *Remand Order* PP 24–28. The domestic precedent agreements evidenced a need for 42% of the Nexus Project's capacity, and FERC found that existing pipelines did not have enough capacity to ship that amount of gas. *Id.* P 27. FERC explained that, in light of the other benefits of the Nexus Project and the small adverse impacts of the project, the need demonstrated by the 42% subscription rate was enough to justify the pipeline. *Id.*

Specifically, FERC found that the Nexus Project was needed to alleviate a bottleneck in the capacity to transport gas

---

[4] The City suggests that FERC's justifying the certificate on this ground was outside the scope of *Oberlin I*'s mandate. But "once FERC reacquired jurisdiction, it had the discretion to reconsider the whole of its original decision." *Se. Mich. Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C. Cir. 1998).

from the Appalachian Basin and to increase supply to Midwestern markets. *Id.* P 25. FERC also explained that building a pipeline with excess capacity would enhance the pipeline grid for the future. *Id.* On the costs side of the ledger, FERC decided that the adverse impacts of the Nexus project were small because Nexus was able to acquire 93% of the land it needed without resorting to eminent domain. *Id.* P 26. Taking all that into account, FERC decided that the Nexus Project was in the public convenience and necessity even excluding the export precedent agreements. As part of that decision, FERC considered but rejected the alternative of approving a pipeline sized to transport 42% of the Nexus Project's capacity—the amount required by the domestic precedent agreements. *Id.* P 28 n.73. FERC explained that its initial analysis of a pipeline 59% of the size of the Nexus Project remained instructive. The benefit of avoiding future pipeline construction, and the resulting cost and environmental impacts, continued to outweigh the small reduction in the burden on landowners that a smaller pipeline would yield. *Id.*

We find FERC's independent and alternative reasons for approving the pipeline without considering the export precedent agreements to be reasonable. There is no floor on the subscription rate needed for FERC to find a pipeline is or will be in the public convenience and necessity. *See Oberlin I*, 937 F.3d at 605 (rejecting the City's argument that that a 59% subscription rate was too low to justify the Certificate). Instead, FERC engages in a "flexible inquiry," considering "a wide variety of evidence to determine the public benefits of the project." *Id.* FERC concluded that existing pipelines could not transport the amount of gas required by the domestic precedent agreements; that finding, in combination with FERC's reasonable balancing of the Nexus Project's other benefits and adverse impacts, satisfies the APA.

The City launches a few objections at FERC's analysis, but none render the decision arbitrary and capricious. First, the City contends that FERC did not identify which pipelines FERC considered in determining that existing pipelines did not have enough capacity to transport the gas the Nexus Pipeline would move. But FERC identified the pipelines on remand in precisely the same manner it did in its initial order—by looking at "other pipeline compan[ies'] electronic bulletin boards." *Compare Remand Order* P 27, *with Certificate Order* P 40 n.29. Even assuming that is insufficient, the City did not challenge this aspect of FERC's order in *Oberlin I* and therefore cannot do so now. *Nw. Ind. Tel. Co. v. FCC*, 872 F.2d 465, 470 (D.C. Cir. 1989) ("It is elementary that where an argument could have been raised on an initial appeal, it is inappropriate to consider that argument on a second appeal following remand.").

Second, the City complains FERC did not analyze a hypothetical pipeline specifically sized to transport 42% of the Nexus Project's capacity. But given that FERC had analyzed a pipeline sized to transport 59% of the Nexus Project's capacity, there was no need for FERC to start its analysis anew. FERC had already found that shrinking the project would barely reduce the amount of land that the project would require, and that excess capacity could reduce the costs and disruption from constructing additional pipelines in the future. *Certificate Order* PP 42–45. FERC's determination that this reasoning applied to a pipeline sized for 42% of the Nexus Project's capacity was reasonable.[5]

---

[5] The City's other complaints about FERC's reasoning are insubstantial and we reject them without further discussion.

20

\* \* \*

Because FERC's explanation on remand from this court was reasonable and because its decision comported with the Natural Gas Act and the Takings Clause, we deny the City's petition.

*So ordered.*