# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 8, 2016         Decided March 22, 2016

No. 15-1035

MAHER TERMINALS, LLC,
PETITIONER

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
INTERVENOR

———

On Petition for Review of Final Memorandum Opinion and
Order
of the Federal Maritime Commission

———

*Richard P. Bress* argued the cause for petitioner. With him
on the briefs were *Melissa Arbus Sherry* and *Benjamin W.
Snyder*.

*Joel F. Graham*, Attorney, Federal Maritime Commission,
argued the cause for respondents. With him on the briefs were
*William J. Baer*, Assistant Attorney General, U.S. Department
of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*,
Attorneys, and *Tyler J. Wood*, General Counsel, Federal
Maritime Commission.

*Richard A. Rothman* and *Peter D. Isakoff* were on the briefs for intervenor the Port Authority of New York and New Jersey in support of respondent.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge:* Petitioner Maher, a marine terminal operator, challenges a decision of the Federal Maritime Commission authorizing preferential lease terms to a competitor, APM-Maersk. We grant the petition and remand because we think the Commission provided an inadequate explanation.

I.

In the late 1990s, the Port Authority began negotiating new leasing terms for maritime terminal operators servicing the Port of New York and New Jersey. This was a part of an overall effort to modernize the port's facilities and make it an attractive location for shipping into the future. Among the companies the Port Authority negotiated with were Maher and APM-Maersk. Maher is an independent marine terminal operator, which means that it has no affiliated carrier fleet, and services only third party carriers and shippers through its rented terminal. APM-Maersk, on the other hand, is affiliated with the largest ocean carrier-fleet in the United States, Sea-Land, though it also services third party cargo through its terminals.[1]

---

[1]What we refer to as APM-Maersk now, as a result of mergers and acquisitions over the period in question, includes both Sea-Land

Lease negotiations between Maher and the Port Authority began in 1995. Maher sought an agreement that would make it competitive with other terminal operators, and tentative terms, including an effective annual rate of $68,750 per acre, were reached in late 1997. Negotiations with Maher were suspended in 1998, however, when the Port Authority began negotiating with APM-Maersk. That larger terminal operator had found the initial terms offered by the Port Authority too expensive, and threatened to go to Baltimore. APM-Maersk's business was critical to the Port of New York and New Jersey because of the high volume of container business it could bring through its affiliated carriers. Indeed, Maher's CEO expressed great concern over the potential departure, writing a letter to the Governor of New Jersey warning of the "grave" risk to the port.

The Port Authority opened negotiations with APM-Maersk in July by offering a 350-acre terminal at a rate of $63,000 per acre, per year. That was rejected. Later, in September, the offer was reduced to $36,000 per acre, but again rebuffed. APM-Maersk made clear that it would require as much as $120 million in cost reduction in order to make the port as attractive as other options. The Port Authority finally agreed, and submitted terms that included $30 million in capital and structural improvements paid for by the Port Authority at the terminal, as well as $90 million in basic rent reduction. Those concessions, of $120 million total, reduced APM-Maersk's effective base rent to $19,000 per acre, per year.

Since the purpose of the concessions was to keep APM-Maersk, because of its affiliated carrier fleet and the promise of additional tonnage of cargo, the Port Authority got a "port guarantee," requiring APM-Maersk to actually bring cargo from its affiliated carriers through the port. The Port Authority hoped

---

and Maersk shipping companies.

that meant APM-Maersk would not entice third party carriers away from other terminal operators, like Maher. A deal was reached at an effective annual base rent of $19,000 per acre, with certain penalties designed to increase the rent where the port guarantee was not met.

With APM-Maersk secured as a tenant, the Port Authority turned back to negotiations with Maher. Maher sought parity with APM-Maersk, but the Port Authority was unwilling to offer the same terms. Lacking the bargaining power enjoyed by APM-Maersk, Maher ultimately agreed to an initial base rent of $39,750 per acre, with an escalator, such that the average base rent over the life of the lease would amount to $53,753 per acre. While the exact annual base rent charged to APM-Maersk may be somewhat variable over the period of the 30-year lease (due to the possibility of penalties for failure to meet cargo guarantees), it is undeniable that Maher was forced to pay substantially more than APM-Maersk.

Maher was purchased by Deutsche Bank in 2007. As the global recession hit in 2008,the port's total container traffic fell for the first time in almost 15 years. Maher lost nearly 15% of its business, while APM-Maersk failed to meet its port guarantees in 2008, 2009, and 2010.

On June 3, 2008, nearly 8 years after executing its lease, Maher filed a complaint against the Port Authority, alleging that the differential terms between its and APM-Maersk's leases violated the Shipping Act. It alleged that the Port Authority had violated 46 U.S.C. § 41106(2) in offering an "unreasonable preference" to APM-Maersk.

After some dispute regarding the applicable statute of limitations for the claims,[2] the merits came before an ALJ, who issued a decision on April 25, 2014, denying the claims. Maher appealed, and the Federal Maritime Commission affirmed on December 17, 2014.

The Commission did not deny that the Port Authority had treated Maher and APM-Maersk differently, but the Commission explained the difference was justified, on three counts. First, APM-Maersk had threatened credibly to abandon the port. Maher could make no such threat. Second, APM-Maersk was able to make a port guarantee, relying on its affiliated carrier fleet, that Maher was not. Finally, Maher's terminal was of a higher quality than was APM-Maersk's, thus justifying a higher rent. The Commission similarly dismissed a separate unreasonable practices claim, explaining that Maher had not met its assigned burden under the applicable regulations.

II.

It is common ground in this case that differences between similar entities contracting with Port Authorities must be based on "transportation factors." That term goes back to the Interstate Commerce Act and was extended into the earliest Shipping Act.[3] It is not clear whether it was originally

---

[2]Shipping Act claims, as relevant here, have a statute of limitations of three years. On that basis, summary judgment was requested against Maher. The FMC ultimately held that Maher's request for a cease-and-desist order was not time-barred, and that in the event a violation was found, Maher was entitled to reparations for the full three-year period, though not for the period before that running back to the execution of the lease.

[3]*See generally*, *Distribution Services, Ltd. v. Transpacific Freight Conference of Japan*, 24 S.R.R. 714, 719-21 (FMC 1988).

articulated as an interpretation of the statutory term "undue or unreasonable preference"[4] or whether it was a policy choice. Perhaps that is why petitioner conflates its challenge as both a statutory claim and an arbitrary/capricious one. And the dispute is further limited by the Commission's concession that neither the port guarantee nor Maersk's supposed superior terminal quality would justify the lower rent. The Commission's decision thus rises or falls on APM-Maersk's credible threat to leave the Port of New York and New Jersey – which the Commission claims is a "transportation factor," justifying the distinction in the treatment of APM-Maersk and Maher.

Before considering the issue on which the dueling briefs concentrate – whether a large terminal operator's threat to leave can be legitimately regarded as a "transportation factor" – the more obvious question raised by petitioner is why the same rates were not offered to it, which would avoid the issue of discrimination altogether. In that regard, the Commission's explanation in its Order is circular. It said, "The Port's decision *not* to give Maher certain [the same] lease terms cannot be divorced from its decision to give those terms to APM-Maersk." (Emphasis added.) In other words, we understand the Commission to be saying that the reasons APM-Maersk were given new terms somehow necessarily implies that petitioner should not be given the same terms. But that is a *non sequitur*. Whatever the reason the port determined to give lower rates to APM-Maersk, it doesn't at all follow that those same or similar rates should not be offered to petitioner. After all, the

---

[4] 46 U.S.C. § 41106(2) instructs that a "marine terminal operator" may not "give any undue or unreasonable preference or advantage or impose any undue or unreasonable prejudice or disadvantage with respect to any person...".

Commission has previously ordered that same remedy.[5] (Indeed, APM-Maersk sought lower lease rent for itself; it did not seek preferential rates *vis-a-vis* competitors in the Port of New York.)

To be sure, the intervenor, the Port Authority, argued that it would be commercially irrational for it to extend the same terms to Maher. Even if we could accept intervenor's explanations for that of the Commission – which, of course, we cannot – that terse comment is hardly adequate. There are all sorts of factors that might bear on that issue, including economic conditions in the port and the competitive impact of the preference.

Assuming *arguendo* that the Commission adequately responded to petitioner's contention that the same rates should be extended to it, the Commission's explanation as to why APM-Maersk's preference was based on a "transportation factor" was hopelessly convoluted, particularly in light of its precedent. The two cases upon which petitioner relies are *Ballmill Lumber v. Port of New York*, 10 S.R.R. 131 (FMC 1968) and *Ceres Marine Terminal v. Maryland Port Administration*, 27 S.R.R. 1251 (FMC 1997).

In *Ballmill*, Port Newark granted an exception to the largest lumber wholesaler, Weyerhauser, from a general policy previously applied to Ballmill. That policy obliged lumber wholesaler tenants to contract for logistical services with either the Port Authority itself or certain approved vendors. Weyerhauser was instead permitted to provide these services from its own in-house entity. The port sought to justify the preference based on Weyerhauser's bargaining position. The

---

[5]*See Ballmill Lumber & Sales Corp. v. Port of N.Y. Auth.*, 10 S.R.R. 131 (FMC 1968).

wholesaler was threatening to leave the Port of Newark if it didn't get the terms it wanted. The Commission rejected that justification, and thus held it was an "unreasonable preference." Interestingly, the Commission never even referred to the term "transportation factor."

Then, more recently, in *Ceres*, the Commission rejected the preferential rates the Maryland Port Authority granted Maersk at the Port of Baltimore for dockage, crane rental and land rental charges. The port presented a strikingly similar argument to that presented in our present case; that Maersk, then operating its own shipping line, threatened to switch to Norfolk, Virginia, which was seeking additional Maersk business.[6] The Commission was told Maersk's loss would be a devastating blow to Baltimore. The Commission, nevertheless, held that the cargo guarantees Maersk offered, and its size, did not justify the differential *vis-a-vis* Ceres. Put succinctly, the Commission said, "status alone is not a sufficient basis by which to distinguish between lessees."

The Commission did not overrule these cases. Instead, it offered rather lame distinctions we find quite unpersuasive. It stated that in *Ballmill*, the Commission did not *in hoc verba* reject the threat to leave the port as a legitimate justification. Therefore, it supposedly could have thought the threat was not credible (even though that was not even argued). And the Commission "interpreted" *Ceres* as holding only that preferential rates could not be based on status alone (a terminal operator's affiliation with a carrier), even though the port's argument had been squarely based on Maersk's threat to leave – with its affiliated carrier.

---

[6]That was prior to its affiliation with Sea-Land.

We express no views on whether the Commission could overrule or modify its previous decisions, but it must do so in a forthright manner. The distinctions the Commission offered were utterly unpersuasive. *See Bush-Quayle '92 Primary Committee, Inc. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997) ("Without adequate elucidation, this court has no way of ascertaining whether cases are indeed distinguishable, whether the Commission has a principled reason for distinguishing them, or whether the Commission is refusing to treat like cases alike.").

We note that in *Ceres*, although at the outset of its opinion the Commission describes the governing law as permitting discrimination based on "transportation factors," its following discussion only asked whether the discrimination was "reasonable." This "reasonableness" standard was also applied in our case; the Commission said Maher had not "met its burden of showing that the Port's reasons...[were] unreasonable." Does that mean the term "transportation factor" is simply a synonym for reasonable? If so, how does the Commission distinguish between reasonable and unreasonable preferences?

In sum, we must remand this case to the Commission for an adequate explanation of its decision and its policy. It is obvious the underlying problem is competition between ports for a larger share of carrier traffic. We wonder if there is not a regulatory solution to the problem.

\*\*\*

For the foregoing reasons, the Order is remanded back to the Commission.

*So ordered.*