# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 6, 2019          Decided September 6, 2019

No. 18-1248

CITY OF OBERLIN, OHIO,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEXUS GAS TRANSMISSION, LLC,
INTERVENOR

———

Consolidated with 18-1261

———

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

———

*Carolyn Elefant* argued the cause for petitioners. With her on the briefs were *Aaron Ridenbaugh* and *David A. Mucklow*.

*Carol J. Banta*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *James P. Danly*, General Counsel, and *Robert H. Solomon*, Solicitor.

*David A. Super* argued the cause for intervenor. With him on the brief were *Kevin A. Ewing* and *Britt Cass Steckman*.

Before: ROGERS, SRINIVASAN, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Concurring Opinion filed by *Circuit Judge* ROGERS.

WILKINS, *Circuit Judge*: In reviewing an agency's justifications for its actions, principles of administrative law demand, sensibly, that we strike a balance. On the one hand, we must not micromanage. Agencies are the experts and requiring full exposition at every turn would impede their ability to carry out their specialized statutory duties. On the other hand, we must insist on reasoned justifications.

The instant matter asks us, once again, to perform this balancing act. Petitioners are the City of Oberlin, Ohio, and the Coalition to Reroute Nexus, an organization of landowners. They ask us to vacate the Federal Energy Regulatory Commission's order authorizing Nexus Gas Transmission, LLC, to construct and operate an interstate natural gas pipeline and exercise the right of eminent domain to acquire any necessary rights-of-way. Petitioners also ask us to vacate the Commission's order denying their requests for rehearing. In short, Petitioners complain that the Commission's orders allowed the pipeline to transect their properties, to their properties' detriment, and gave Nexus the right to condemn certain easements over their objections.

Petitioners raise many arguments, the vast majority of which we reject. We agree with them, however, that the Commission failed to adequately justify its determination that it is lawful to credit Nexus's contracts with foreign shippers serving foreign customers as evidence of market demand for the interstate pipeline. Accordingly, we remand without vacatur to the Commission for further explanation of this determination.

**I.**

The Natural Gas Act, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. §§ 717-717z), vests authority in the Commission to regulate the transportation and sale of natural gas in interstate commerce. In passing it, Congress had two principal aims: "encourag[ing] the orderly development of plentiful supplies of . . . natural gas at reasonable prices," *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 101 (D.C. Cir. 2014) (quoting *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976)) (alteration in original), and "protect[ing] consumers against exploitation at the hands of natural gas companies," *id.* (quoting *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 610 (1944)) (alteration in original).

Section 7 of the Act requires an entity seeking to construct or extend an interstate pipeline for the transportation of natural gas to obtain from the Commission a "certificate of public convenience and necessity." 15 U.S.C. § 717f(c)(1)(A). In a policy statement, the Commission set forth the criteria it considers in reviewing an application for a Section 7 certificate. *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (Sept. 15, 1999), *clarified*, 90 FERC ¶ 61,128 (Feb. 9, 2000), *further clarified*, 92 FERC ¶ 61,094 (July 28,

2000) ("Certificate Policy Statement"). First, an applicant must demonstrate that it is "prepared to develop the project without relying on subsidization by the sponsor's existing customers." 88 FERC at 61,750. If the applicant makes this showing, the Commission will issue a certificate of public convenience and necessity only if a project's public benefits (such as meeting unserved market demand) outweigh its adverse effects (such as a deleterious environmental impact on the surrounding community). 90 FERC at 61,396. If the Commission issues a Section 7 certificate to an applicant, the Act confers on the certificate holder the right to "exercise . . . eminent domain" to acquire any land necessary to the project's completion. 15 U.S.C. § 717f(h).

As part of the Section 7 certificating process, before approving an interstate gas pipeline the Commission must complete an environmental review of the proposed project under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Specifically, for federal actions of requisite significance (including the issuance of a Section 7 certificate), NEPA requires an agency to prepare an Environmental Impact Statement, § 4332(C), in which the agency must "identify the reasonable alternatives to the contemplated action and . . . . look hard at the environmental effects of [its] decision," including a project's impact on public safety. *Corridor H Alts., Inc. v. Slater*, 166 F.3d 368, 374 (D.C. Cir. 1999) (citation omitted).

Lastly, we note that the Commission has limited authority to regulate the import and export of natural gas under Section 3 of the Act, 15 U.S.C. § 717b. *See generally EarthReports, Inc. v. FERC*, 828 F.3d 949, 952-53 (D.C. Cir. 2016). Section 3 provides that no person shall import or export natural gas "without first having secured an order of the Commission

authorizing it to do so," and it instructs that the Commission shall issue such an order unless its finds that the import or export "will not be consistent with the public interest." 15 U.S.C. § 717b(a). As the Commission has explained, however, Congress transferred Section 3's regulatory function to the Secretary of Energy. *See Rover Pipeline, LLC*, 158 FERC ¶ 61,109, ¶ 49 n.43 (Feb. 2, 2017) (citing 42 U.S.C. § 7151(b)). Subsequently, the Secretary delegated back to the Commission the narrow authority to approve or disapprove the construction and siting of facilities where natural gas will be imported or exported. *Id.* (citing U.S. Dep't of Energy, Delegation Order No. 00-004.00A, § 1.21.A (eff. May 16, 2006)). But the Secretary retains exclusive authority to approve or disapprove the import and export of natural gas. *Id.*

## II.

On November 20, 2015, Nexus sought from the Commission authorization under Section 7 to build and operate approximately 257 miles of a new natural gas pipeline to transport 1.5 million dekatherms per day ("dth/day") of Appalachian Basin shale gas to consuming markets in northern Ohio, southeastern Michigan, and Ontario, Canada. The pipeline begins and ends in the United States; it extends from Hanover Township in Columbiana County, Ohio, to Ypsilanti Township in Washtenaw County, Michigan. In marketing the pipeline from 2012 through 2015, Nexus entered into precedent agreements – *i.e.*, long-term contracts – with eight different entities, for 885,000 dth/day, or 59%, of the pipeline's 1.5 million dth/day capacity. Of the eight entities Nexus contracted with, four are affiliates of the pipeline's sponsors, and two are "Canadian companies serving customers in Canada." Resp't's Br. 28 (citing J.A. 1228). Nexus's precedent agreements with the Canadian shippers are for a total of 260,000 dth/day. *Id.*

On August 25, 2017, the Commission issued an order granting Nexus a Section 7 certificate of public convenience and necessity. *See Nexus Gas Transmission, LLC*, 160 FERC ¶ 61,022 (Aug. 25, 2017); J.A. 1036-123. And on July 25, 2018, the Commission issued an order denying Petitioners' requests for rehearing. *See Nexus Gas Transmission, LLC*, 164 FERC ¶ 61,054 (July 25, 2018); J.A. 1206-89. In its orders, the Commission made three determinations that are especially relevant to Petitioners' challenges. First, it found that Nexus's precedent agreements were "the best evidence" that the pipeline served unmet market demand. *Id.* at 1218. Second, it approved Nexus's proposed 14% return on equity, subject to the condition that Nexus design its initial customer rate based on a hypothetical capital structure of 50% equity and 50% debt. *Id.* at 1233. Third, it found that the pipeline does not "represent a significant safety risk to the public." *Id.* at 1259.

On October 2, 2017 (*i.e.*, after the Commission issued Nexus a Section 7 certificate but before it denied Petitioners' requests for rehearing), Nexus filed a condemnation action, pursuant to Section 7, *see* 15 U.S.C. § 717f(h), against Petitioners in the Northern District of Ohio. On December 28, 2017, the district court found that Nexus had the right to exercise eminent domain to condemn certain easements over Petitioners' properties. *See Nexus Gas Transmission, LLC v. City of Green,* No. 5:17-cv-2062, 2017 WL 6624511, at *3 (N.D. Ohio Dec. 28, 2017), *appeal dismissed*, 2018 WL 2072616 (6th Cir. Feb. 9, 2018). Shortly thereafter, Nexus exercised that right. *See* Pet'rs' Br., Standing Addendum 3.

In September 2018, Petitioners filed the instant matter. They ask us to vacate the Commission's order of August 25, 2017, granting Nexus a Section 7 certificate, as well as its order

of July 25, 2018, denying Petitioners' requests for rehearing. On May 6, 2019, we heard oral argument. Thereafter, based on certain post-argument events, Nexus filed a motion to dismiss for lack of subject matter jurisdiction, which, for reasons explained below, we denied.

**III.**

We have jurisdiction over the petitions pursuant to the Natural Gas Act. *See* 15 U.S.C. § 717r(b). Under the statute, any party that is "aggrieved" by an order of the Commission may petition for review of that order, so long as they first seek rehearing with the Commission. *Id.* § 717r(a)-(b). Petitioners meet these criteria. They sought rehearing of the Commission's order granting Nexus a Section 7 certificate, and we have held that landowners like Petitioners, who are "forced to choose between selling to a FERC-certified developer and undergoing eminent domain proceedings," are "'aggrieved' within the meaning of the Act." *Sierra Club v. FERC*, 867 F.3d 1357, 1365 (D.C. Cir. 2017) (citing *B&J Oil & Gas v. FERC*, 353 F.3d 71, 75 (D.C. Cir. 2004)).

Before proceeding, however, we must also discharge our "independent duty to ensure that at least one petitioner has standing under Article III of the Constitution." *Sierra Club*, 867 F.3d at 1365 (internal citation omitted). To establish Article III standing, a petitioner "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (internal citation omitted).

In its motion to dismiss submitted after oral argument, Nexus argues that Petitioners no longer suffer redressable

injuries in fact. According to Nexus, this is because, since oral argument, Petitioners and Nexus executed easement agreements that settled the issue of compensation for Nexus's takings, *see* Pet'rs' Response to Motion to Dismiss, Exhibits 2, 6, and thereafter the parties entered into joint notices and stipulations of dismissal in the condemnation action in the Northern District of Ohio, *see id.* Exhibits 3, 7.

The law of our circuit is clear that a landowner is injured in fact when she is *put to the choice* of having to either reach an agreement with a pipeline seeking to access her property or have her property condemned. *See Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 271-72 (D.C. Cir. 2015) ("[A] landowner made subject to eminent domain by a decision of the Commission has been injured in fact because the landowner will be forced either to sell its property to the pipeline company or to suffer the property to be taken through eminent domain.") (internal citation omitted); *see also B&J Oil*, 353 F.3d at 75 ("[Petitioner] unquestionably suffers from an injury-in-fact. As a result of the Commission's orders, [petitioner] . . . must either sell its land to [the pipeline] or allow [the pipeline] to take its property through eminent domain. . . . That [the pipeline] ultimately will compensate [petitioner] for its property does nothing to erase [petitioner's] legally cognizable injury."). Accordingly, the fact that the parties reached an agreement as to compensation for Nexus's takings does nothing to vitiate Petitioners' injuries to their property interests.[1] In addition, Petitioners' injuries are directly traceable to the Commission's orders (because the orders permitted the pipeline to transect

---

[1] We note, too, that the joint stipulations of dismissal that the parties executed explicitly provide that the dismissal of the claims in the condemnation action "shall have no application" to Petitioners' claims in the instant matter. Pet'rs' Resp. to Mot. to Dismiss 8 (quoting Exs. 3, 7).

their land and authorized Nexus to condemn it), and if we vacate those orders Petitioners' injuries are likely to be redressed, *see Nexus Gas Transmission, LLC*, 162 FERC ¶ 61,011, at P 7 (2018) ("[T]o the extent that [Nexus] elects to proceed with construction, it bears the risk that . . . our orders will be overturned on appeal. If this were to occur, [Nexus] might not be able to utilize any new facilities and could be required to remove them or to undertake further remediation."). We find, therefore, that Petitioners have Article III standing to bring the petitions.

**IV.**

We must set aside a decision of the Commission if it is arbitrary and capricious or otherwise contrary to law. *TNA Merch. Projects, Inc. v. FERC*, 857 F.3d 354, 358 (D.C. Cir. 2017). Accordingly, where an agency's "explanation is lacking or inadequate, the court must remand for an adequate explanation of the agency's decision and policy." *BP Energy Co. v. FERC*, 828 F.3d 959, 965 (D.C. Cir. 2016) (citing *Maher Terminals LLC v. Fed. Mar. Comm'n*, 816 F.3d 888, 892 (D.C. Cir. 2016)). The Commission's factual findings are conclusive "if supported by substantial evidence." 15 U.S.C. 717r(b).

**A.**

Petitioners argue that the Commission's finding that Nexus's precedent agreements are the "best evidence" of project need, *see* J.A. 1218, is not supported by substantial evidence. In support of this argument, Petitioners wage a three-pronged attack.

First, Petitioners assert that the Commission contravened its Certificate Policy Statement by relying on Nexus's

precedent agreements for "a paltry 59 percent of new capacity" as the best evidence of project need. Pet'rs' Br. 24-25. Specifically, Petitioners contend that the policy statement only allows precedent agreements to serve as "strong evidence of market demand" when they represent "most of the new capacity" of the pipeline and that 59% is not "most of the new capacity." *Id.* (citing 88 FERC at 61,749). But that argument is fundamentally misguided: the Certificate Policy Statement imposes no bright-line rule about when precedent agreements may be persuasive evidence of market demand. Instead, it lays out a flexible inquiry that allows the Commission to consider a wide variety of evidence to determine the public benefits of the project. And here, the Commission engaged in that broad-ranging inquiry reasonably. Although the precedent agreements represented only 59% of Nexus's capacity, the Commission determined that existing pipelines could not absorb that amount of gas. *See* J.A. 1050-53, 1219-20. Given that analysis, the Commission reasonably concluded under the Certificate Policy Statement that the precedent agreements – which firmly established that there was more demand for natural gas in the Nexus pipeline's delivery region than existing pipelines could meet – were the best evidence of project need.

Second, Petitioners assert, Nexus's precedent agreements are not meaningful evidence of project need because half of them are with affiliates of the pipeline's sponsors. According to Petitioners, this is problematic because affiliate agreements "are not necessarily the product of arms-length negotiations." Pet'rs' Br. 25-26. This argument, too, is without merit. The Commission rationally explained that it fully credited Nexus's precedent agreements with affiliates because it found no evidence of self-dealing (a finding Petitioners do not dispute), and because Nexus bears the risk for any unsubscribed

capacity. *See* J.A. 1125. Moreover, as the Commission explained, when it ended its policy of requiring pipelines to demonstrate a specific subscription rate, "it was reducing 'the significance of whether the [precedent agreements] are with affiliated or unaffiliated shippers.'" J.A. 1224 (quoting 88 FERC at 61,748). Consistent with this, this Court has also recognized that "it is Commission policy to not look behind precedent or service agreements to make judgments about the needs of individual shippers." *Myersville Citizens for a Rural Cmty., Inc.*, v. *FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (quoting *Dominion Transmission, Inc.*, 141 FERC ¶ 61,1240, at P 66 (Dec. 12, 2012)); *see also Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *1 (D.C. Cir. Feb. 19, 2019) (holding that the Commission "reasonably explained that '[a]n affiliated shipper's need for new capacity and its obligation to pay for such service under a binding contract are not lessened just because it is affiliated with the project sponsor'") (quoting *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, ¶ 45 (Oct. 13, 2017)) (alteration in original).

Third, Petitioners argue, Nexus's precedent agreements are not strong evidence of market demand because a substantial portion of them are dedicated for export. In Petitioners' view, because the Secretary of Energy authorizes exports under Section 3 of the Act, the Commission may not use precedent agreements for export "to justify project need under Section 7 [,] which governs certificates for projects in interstate commerce." Pet'rs' Br. 21. Moreover, Petitioners contend, because Section 7 confers on a certificate holder the right to exercise eminent domain, crediting export agreements toward a Section 7 finding of project need runs afoul of the Takings Clause, as a private pipeline selling gas to foreign shippers serving foreign customers does not serve a "public use" within the meaning of the Fifth Amendment. *Id.* at 36 (quoting U.S.

CONST. amend. V ("[P]rivate property [shall not] be taken for public use, without just compensation.")).

This argument raises legitimate questions, which the Commission has heretofore failed to adequately answer. On the record before us, two of Nexus's precedent agreements for a total of 260,000 dth/day are, as the Commission concedes, with "Canadian companies serving customers in Canada." Resp't's Br. 12 (citing J.A. 1228). If the Commission excluded these agreements from its Section 7 analysis of project need, Nexus would have precedent agreements for only 625,000 dth/day, or approximately 41.6% of its 1.5 million dth/day capacity. And because the Commission never considered whether the public benefits of the Nexus pipeline would outweigh its adverse impacts if it were only subscribed for 625,000 dth/day (a substantial decrease from the analyzed 805,000 dth/day), we may affirm its finding of public convenience and necessity only if the Commission's inclusion of the export precedent agreements in its analysis was proper.

But the Commission never explained why it is lawful to credit demand for export capacity in issuing a Section 7 certificate to an interstate pipeline. In response to Petitioners' argument that it is not, the Commission simply recited its findings that: (1) a substantial amount of the pipeline's subscribed capacity is for domestic consumption; (2) all shipper commitments have secondary delivery rights within the United States; and (3) Nexus's application listed eleven interconnections with potential customers. J.A. 1228-29. But these facts do not explain why it is lawful for the Commission to predicate a Section 7 finding of project need on precedent agreements with foreign shippers serving foreign customers. Section 7 states that the Commission may issue a certificate of public convenience and necessity for "the transportation in

*interstate commerce*," § 717f(c)(2) (emphasis added), and we have explicitly refused to "interpret 'interstate commerce'" within the context of the Act "so as to include foreign commerce," *Border Pipe Line Co. v. Fed. Power Comm'n*, 171 F.2d 149, 152 (D.C. Cir. 1948). *See also Distrigas Corp. v. Fed. Power Comm'n*, 495 F.2d 1057, 1063 (D.C. Cir. 1974) (reaffirming *Border Pipe Line*).

Moreover, in response to Petitioners' argument that relying on demand for export in issuing a Section 7 certificate runs afoul of the Takings Clause, the Commission merely stated that it has previously addressed this issue and offered citation to authority. J.A. 1229 (collecting FERC cases). But just one of the FERC cases the Commission cites addressed the specific question of whether predicating a Section 7 finding of project need on precedent agreements for export contravenes the Takings Clause. *See Transcon. Gas Pipe Line Co.*, 161 FERC ¶ 61,250 (Dec. 6, 2017), at ¶¶ 30-35. Furthermore, in that single case, the Commission relied on the inadequate explanation that such a circumstance does not present a Takings Clause problem because: once the Commission determines that a pipeline is required by the public convenience and necessity, Section 7 authorizes the certificate holder to exercise the right of eminent domain, and "Congress did not suggest that there was a further test . . . such that certain certificated pipelines furthered a public use . . . while others did not." *Id.* ¶¶ 31-32. This reasoning begs the unanswered question of whether – given the fact that Section 7 authorizes the use of eminent domain – it is lawful for the Commission to

credit precedent agreements for export toward a finding that a pipeline is required by the public convenience and necessity.[2]

When pressed on this issue at oral argument, the Commission again did not explain why it is lawful to credit precedent agreements for export in issuing a Section 7 certificate for the construction and operation of an interstate pipeline. *See* Oral Arg. 16:45-28:10. Rather, the Commission repeated that, in approving Nexus's application, it was "looking at the benefits to the domestic markets." Oral Arg. 27:34-39. As we have explained, this statement has no explanatory value with respect to the question of why it is lawful for the Commission, as it did here, to predicate a Section 7 finding of need for an interstate pipeline on a pipeline's precedent agreements for export. [3]

Accordingly, we remand to the Commission for further explanation of why – under the Act, the Takings Clause, and

---

[2] We acknowledge that, in *Transcontinental Gas*, in an attempt to fortify its reasoning, the Commission also "note[d]" that before any gas is exported, the Department of Energy, pursuant to Section 3 of the Act, would first "need to find that such exportation is not inconsistent with the public interest." *Id.* at 34 (citing 15 U.S.C. § 717b(a)). True. It is insufficient, however, to simply assume that such a finding under Section 3, which does not authorize the exercise of eminent domain, is somehow equivalent to a finding that a given export constitutes a public use within the meaning of the Takings Clause.

[3] To the extent that Petitioners argue that the Commission can never lawfully issue a Section 7 certificate where a pipeline has precedent agreements for export, *see* Pet'rs' Br. 33-35, we note that we disagree. We disagree because a pipeline may clearly be required by the public convenience and necessity *independent of* any of its precedent agreements for export. But, as explained, the Commission has not made any finding to that effect in this case.

the precedent of this Court and the Supreme Court – it is lawful to credit precedent agreements with foreign shippers serving foreign customers toward a finding that an interstate pipeline is required by the public convenience and necessity under Section 7 of the Act.

**B.**

Petitioners also attack the Commission's approval of the specific formula that Nexus used to design its initial consumer rate.

As we had occasion to discuss relatively recently, one of the Commission's duties under the Act is to regulate the rates pipelines charge their customers. *See generally Sierra Club*, 867 F.3d at 1376-79. As part of a Section 7 proceeding, the Commission reviews a pipeline's proposed initial rate and will approve it if the agency finds that it is in the "public interest." *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 390-91 (1959). A pipeline's initial rate remains in place until permanent "just and reasonable" rates are established pursuant to ratemaking procedures under Sections 4 and 5 of the Act. *See Mo. Pub. Serv. Comm'n v. FERC*, 601 F.3d 581, 583 (D.C. Cir. 2010) (citing 15 U.S.C. §§ 717c-d).

Nexus sought to design its initial rate based on a 14% return on equity ("ROE") and a hypothetical capital structure of 60% equity and 40% debt. *See* J.A. 1234; *see generally Sierra Club*, 867 F.3d at 1376 ("Like most businesses, a pipeline company is funded by both equity (*i.e.*, investments made by shareholders) and debt. A pipeline's ratio of equity financing to debt financing is called its 'capital structure.'") (internal citations omitted). The Commission, however, did not accept Nexus's proposal. Rather, it approved Nexus's proposed

ROE of 14% but only on the condition that Nexus design its initial rate according to a hypothetical capital structure of 50% equity and 50% debt. J.A. 1236. In other words, in forcing Nexus to design its initial rate according to a 50:50, as opposed to 60:40, equity to debt ratio, the Commission "require[d] the pipeline to charge a lower rate than it had originally requested." *Sierra Club*, 867 F.3d at 1378.

But Petitioners are not satisfied with the Commission's effort to reign in Nexus's initial rate. They argue that a 14% ROE is excessive, even assuming a 50:50 equity to debt ratio, as compared to the returns on other utility investments that state commissions have approved. *See* Pet'rs' Br. 43 (citing J.A. 1778).[4] Moreover, Petitioners contend, the Commission failed to adequately explain why a 14% ROE and 50:50 equity to debt ratio is appropriate for the Nexus pipeline specifically. Petitioners point out that the Commission, in its order issuing Nexus a Section 7 certificate, supported its approval of this formula with nothing more than citation to FERC precedents demonstrating that the Commission has previously approved a 14% ROE and 50:50 equity to debt ratio for new pipelines. *Id.* (citing J.A. 1063). Moreover, Petitioners add, in its order denying Petitioners' requests for rehearing, the Commission merely: (1) offered the generic observation that relatively higher ROE's are appropriate for new market entrants like

---

[4] In addition, Petitioners raise a half-hearted challenge to the Commission's very use of a hypothetical capital structure as a mechanism by which to lower Nexus's initial rate. As Petitioners ultimately concede, however, "*Sierra Club* allows the Commission to use a hypothetical capital structure to minimize rate impacts." Pet'rs' Br. 45-46 (referring to *Sierra Club*, 867 F.3d at 1378 ("FERC is allowed to . . . use a hypothetical capital structure to *decrease* a pipeline's proposed rates, in the interest of consumer protection.") (emphasis in original) (internal citation omitted)).

Nexus because they face greater business risks than their established counterparts; and (2) noted that Nexus bears the financial risk for any unsubscribed capacity. *Id.* at 43-44 (citing J.A. 1235-36). But nowhere, Petitioners emphasize, has the Commission explained "why a flat 14 percent return should apply to all new pipelines irrespective of geographic location, size and cost and need [sic]." *Id.* at 43.

In response, the Commission reiterates that its approval of a 14% ROE and 50:50 equity to debt ratio was appropriate for the Nexus pipeline because new pipelines are inherently riskier, and Nexus bears responsibility for any unsubscribed capacity. Resp't's Br. 41-42 (citing J.A. 1235-36).

In *Sierra Club*, when considering the *precise* question before us – *i.e.,* whether the Commission was justified in approving a 14% ROE based on a 50:50 equity to debt ratio for a new pipeline on the ground that the Commission had done so previously for new pipelines – we "confess[ed] to being skeptical that a bare citation to precedent, derived from another case and another pipeline, qualifies as the requisite 'substantial evidence.'" *Sierra Club*, 867 F.3d at 1378 (citing *N.C. Utils. Comm'n v. FERC*, 42 F.3d 659, 664 (D.C. Cir. 1994) ("[N]aked citation of prior authority for the use of a hypothetical [capital structure] under one circumstance does not automatically justify such in another.")). Ultimately, however, we did not reach this issue because we found that petitioner never properly raised it, having "confin[ed] itself to attacking the use of a hypothetical capital structure more generally." *Id.*

Here, by contrast, Petitioners, in their requests for rehearing and opening brief, argued explicitly that the Commission's bare citation to precedent is inadequate to support its finding that a 14% ROE based on a 50% equity and

50% debt capital structure is appropriate for the Nexus pipeline. *See* J.A. 1176; Pet'rs' Br. 43-44. Thus, the issue is properly before us.

However, after a close examination of the record, we find that the Commission's explanation is hardly as bare as the Petitioners suggest. The Commission did not simply cite its precedent but applied its "established policy" balancing both consumer and investor interests to the particular pipeline at issue, J.A. 1233, and responded to Petitioners' specific objections. It explained the nature of initial rates, as distinct from rates under NGA sections 4 and 5, specifically how "Congress gave the Commission the discretion in section 7 certificate proceedings to approve initial rates that will 'hold the line' and 'ensure that the consuming public may be protected' while awaiting adjudication of just and reasonable rates under the more time-consuming ratemaking sections of the NGA." J.A. 1233 (quoting *Atl. Ref. Co. v. Pub. Serv. Comm'n of N.Y.*, 360 U.S. 378, 390 (1950)). It explained the different risks confronting existing pipelines and the greenfield pipeline at issue, which faces increased business risks (regulatory, contractual, and construction) and greater risks of constructing and servicing new routes because it does not have an existing revenue base, and why Petitioners' reliance on state proceedings was misplaced. J.A. 1234-35. It rejected Petitioners' argument that Nexus faced no risk for the unsubscribed pipeline capacity because "Nexus faces a very real risk that any unsubscribed capacity will reduce its ability to meet its revenue requirement." J.A. 1236. It also explained that adjusting Nexus's proposed hypothetical capital structure reduced the impact of the ROE and thereby "ensures that Nexus's rates are on a level playing field with other greenfield pipelines." J.A. 1236. It concluded, on the record before it, that

an ROE of 14% with an increased debt level would "hold the line." J.A. 1236.

Notably, the Commission even provided an example of how, under its policy, an existing pipeline seeking to expand service would be required to use the ROE underlying its existing system rates, tending to yield a lower rate in view of the lower risk involved. J.A. 1234. In the example provided, an existing pipeline's ROE was 12.2 % rather than the requested 13.0%. Further, it noted that Nexus would be required to file a cost and revenue study three years out that would provide data by which the Commission and interested parties could determine whether the rates remain just and reasonable. J.A. 1235. It is true that the Commission never discussed another possible ROE, other than to reject the equity/debt ratio Nexus initially proposed. *See* J.A. 1234. But we are ill-equipped to second guess the Commission's expert judgment that a 14% ROE with 50/50 equity/debt capital structure will "hold the line," and on this record, we find no basis on which to conclude the Commission's explanation in response to Petitioners' objections is inadequate. *See BP Energy Co. v. FERC*, 828 F.3d 959, 965 (D.C. Cir. 2016). Nor can we find that the Commission "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Veh. Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Accordingly, Petitioners' attack on the Commission's approval of the specific formula that Nexus used to design its initial consumer rate is unsuccessful.

**C.**

Finally, Petitioners raise two arguments attacking the Commission's finding that the pipeline does not "represent a significant safety risk to the public." J.A. 1259. We reject both.

First, Petitioners argue, the Commission impermissibly delegated its obligations under NEPA to independently review the pipeline's potential adverse impacts on public safety. Specifically, Petitioners contend, within its Environmental Impact Statement ("EIS"), the Commission over relied on Nexus's commitment to comply with safety standards promulgated by the Pipeline and Hazardous Materials Safety Administration, a division of the Department of Transportation ("DOT").

Petitioners are wrong. As they concede, *see* Pet'rs' Br. 50, DOT has exclusive authority to establish safety standards for natural gas pipelines, *see* Memorandum of Understanding Between DOT and FERC Regarding Natural Gas Transportation Facilities, https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/docs/1993_DOT_FERC.pdf. And we have held that it is reasonable for the Commission to reference such standards as a component of its review of a pipeline's safety risks, *see EarthReports*, 828 F.3d at 958, which is exactly what the Commission did here. In a thorough analysis, *see* J.A. 1019-43, the Commission explained in detail how Nexus's compliance with DOT standards would address the specific safety concerns that commenters raised. *See, e.g.*, J.A. 1028 ("The DOT regulations specified in 49 CFR 192 require that pipeline operators establish and maintain liaison with appropriate fire, police, and public officials . . . ."). Moreover, the Commission enumerated specific actions Nexus committed to take to account for safety

risks that DOT regulations might not fully address. *See, e.g.*, J.A. 1028 ("In addition to the DOT-required surveys described previously, Nexus . . . would monitor portions of its pipeline system using a supervisory control and data acquisition system."). Accordingly, the Commission fulfilled its duty to independently consider the pipeline's safety risks and, in so doing, it considered DOT regulations in an appropriate fashion.

Second, Petitioners contend, the Commission arbitrarily failed to consider moving the pipeline away from residences and buildings. This is not so. As an initial matter, as the Commission pointed out, *see* J.A. 1025, DOT regulations do not require natural gas pipelines to remain a minimum distance from residences or buildings. DOT has, however, developed a classification system that grades each segment of a pipeline based on population density at a given segment's location, *see* 49 C.F.R. § 192.5, and subjects "high consequence areas," *i.e.*, pipeline segments close to more densely populated areas, to stricter safety standards, *see id.* §§ 192.903, 192.907, 192 App. E. In accordance with this regulatory scheme, the Commission accounted for *every mile* of the Nexus pipeline. *See* J.A. 1020-27. Accordingly, although the Commission may not have considered the pipeline's proximity to buildings and residences in precisely the way Petitioners would prefer, Petitioners' argument that the Commission arbitrarily failed to consider this issue is unfounded.

**V.**

Before concluding, we offer a word regarding our remedy. "The decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Accordingly, we remand without vacatur, because we find it plausible that the Commission will be able to supply the explanations required, and vacatur of the Commission's orders would be quite disruptive, as the Nexus pipeline is currently operational.

\* \* \*

For the foregoing reasons we grant in part and deny in part the petitions for review. We grant the petitions insofar as we remand without vacatur to the Commission for further explanation of why it is lawful to credit precedent agreements for export toward a Section 7 finding that an interstate pipeline is required by the public convenience and necessity. We deny the petitions in all other respects.

*So ordered.*

ROGERS, *Circuit Judge*, concurring.    This court has recently reaffirmed its understanding that the Commission acts lawfully under the Natural Gas Act ("the Act") in granting a Section 7 certification of public convenience and necessity when "much of the [imported] gas will be used for domestic consumption."    *Town of Weymouth v. FERC*, 2018 WL 6921213, at *1 (D.C. Cir. Dec. 27, 2018) (unpubl.).    This harkens back to the court's recognition that "the Commission has long regarded Section 3's public interest standard and Section 7's public convenience and necessity standard as substantially equivalent." *Distrigas Corp. v. FERC*, 495 F.2d 1057, 1065 (D.C. Cir. 1974) (noting FERC Opinion 613). There, the court declined to overrule *Border Pipe Line Co. v. FPC*, 171 F.2d 149, 150–51 (D.C. Cir. 1948), where the court held the power commission lacked jurisdiction under Section 7 to regulate a company located in Texas that transported gas exclusively to Mexico, drawing on the historical distinction between "interstate commerce" and "exports."    In *Distrigas*, 495 F.2d at 1063, the court "agree[d] with the Commission that neither the language nor the legislative history of the Act's interstate commerce definition unambiguously establishes the correctness of the *Border* construction."    It stated that it "would not hesitate" to overrule *Border Pipe Line* if it were convinced that that case's interpretation of Section 7 "would inevitably place imports of natural gas into the sort of regulatory gap" that the Act was designed to fill.    *Id*. at 1063–64.    But the court concluded there was no regulatory gap over imported gas entering an existing pipeline because FERC had "plenary and elastic" authority under Section 3 to place conditions — including conditions substantively equivalent to Section 7 certification requirements — on imported gas. *Id.* at 1064.

In neither *Distrigas* nor *Border Pipe Line* was the issue precisely the same as in the instant case, namely, whether the Commission has authority under Section 7 to consider in certification proceedings precedent agreements with a foreign shipper in evaluating market need for a new pipeline to be

located exclusively within the United States. Whether, absent congressional action, a similar workaround as the court applied in *Distrigas*, or other approach for concluding the Commission had jurisdiction to consider two Canadian shippers' precedent agreements where a significant amount of that gas was expected to be used domestically, would be possible remains to be seen. Here, the Commission's findings regarding the need for and the nature of the NEXUS pipeline are supported by substantial evidence in the record considered as a whole, and the Commission reasonably explained that petitioners mischaracterized the extent to which the project may be used to export gas. *See* Rehg Order ¶ 45; Resp't's Br. 28. So understood, it appears on this record that the question on remand is whether the Commission's "substantial equivalence" interpretation is contrary to the Act. I join the remand to allow the Commission the opportunity to provide an explanation of its authority to rely in Section 7 certification proceedings on precedent agreements with foreign shippers serving foreign as well as domestic customers.